(No. 33357.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAM HERMENS, Plaintiff in Error.

*Opinion filed March 24, 1955.*

RALPH T. SMITH, and IRVING M. WISEMAN, both of Alton, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and RICHARD R. HUSTED, State's Attorney, of Carrollton, (FRED G. LEACH, and GEORGE W. SCHWANER, JR., of counsel,) for the People.

Mr. JUSTICE MAXWELL delivered the opinion of the court:

Sam Hermens, plaintiff in error, Hal Griffith and Clarence Davis were, on March 5, 1954, indicted for the larceny of nine hogs from a farm in Greene County. They were arraigned on March 19, 1954. Griffith pleaded guilty

and was sentenced to the penitentiary for a term of three to five years. Davis pleaded guilty and applied for probation. A hearing on this application was held and the decision was pending at the time of plaintiff in error's trial. Plaintiff in error, hereinafter designated as defendant, pleaded not guilty, was tried by jury, convicted and sentenced to the penitentiary for a term of three to five years. He brings the cause here by writ of error.

On the night of February 17, 1954, nine hogs were taken from the uninhabited farm of one Ernie Ballard, were loaded into the car belonging to codefendant Davis, taken to Woodson, near Jacksonville, where they were sold by codefendant Griffith for the sum of $100. The defendant Hermens contends the evidence heard by the jury is not sufficient to show beyond a reasonable doubt that he participated in this larceny, and if he did, he was too intoxicated at the time to form the specific intent which is a necessary element of that crime.

This case involves three very bibulous miscreants and nine little pigs that illegally went to market. Alcohol, one of our best clients, attendance-wise, played the leading role, supported by the defendants, its puppets. The defendant Hermens testified that he and Mrs. Hermens spent the day of February 16 at their home drinking whiskey, wine and beer; that on the morning of the 17th they resumed this fascinating sport, after he had gone to town to replenish their fast shrinking supply, and on that day he consumed a quart of whiskey, a quart of wine and eighteen bottles of beer. In the early afternoon Griffith and Davis arrived, apparently unheralded and without preconceived plan, bringing with them, at least in the unconsumed state, only a small contribution to the refreshment supply, insufficient to offset the increase in consumption engendered by the jolly fellowship of the occasion. So the four of them, in Davis's car, motored to town to replenish their spirits and brighten the spirits of the supplier.

While gay camaraderie and perfect harmony ruled the day on February 17, the dull and sober atmosphere of the court room, at Hermens's trial, completely destroyed the beautiful friendship and loyal devotion theretofore existing between the parties. As a consequence, we have difficulty in accurately narrating the subsequent events. According to the testimony of the Hermenses and their still-devoted friend, Griffith, they returned directly to the Hermens home, where Hermens, completely overcome by the affluent events of the day, passed out. But according to Davis, whose friendship was as brief as his acquaintance, they did not return directly to the Hermens home, but Hermens directed them to drive past the Ballard farm, not just because of his sentimental attachment for the place where he had lived as a child, but to view some readily marketable shoats residing there in a temptingly, unprotected environment. Mrs. Hermens did not consciously participate in this inspection expedition, as she slept peacefully in the rear seat of the Davis car. At this point, to be fair with Mrs. Hermens, we should point out that she was enjoying the comforts of the back seat before and not after the shoats. Unfortunately, as subsequent developments proved, the parties failed to perceive that one of the nominated quarry had some very distinctive marking, as described by the owner "his ears were red and there was a little red back of his tail and the rest of him was all white." We are unable to locate the "little red back of his tail," and still remain on the same pig, but for our purpose here the red ears will suffice. But to get back to the Davis version of our story, having completed their preliminary survey for the contemplated project, they returned to the Hermens home for a refreshing interlude, awaiting nightfall. Then under cover of darkness, Davis, Griffith and Hermens stealthily returned for a more intimate association with the shoats. Having previously reconnoitered the physical surroundings and selected their choice of the pigs,

according to ease of handling and suitability for their transportation facilities, they parked their car close to the fence at a corner of the pig lot. They then herded the desired number of their unsuspecting quarry into this corner and completed their capture by seizing them, one at a time, by the extremities which the housewife would best recognize as being the shanks of the hams, passed them over the fence to the one who gently, or otherwise, deposited them through the back window in the back part of or on the back seat of the automobile, in such manner that those previously placed there did not escape. On the ride to the town where the prospective new owner resided, the three culprits occupied the front seat of the car with their load of pay dirt in the rear. The record, at least, is silent during this ride. The Davis version of the story then leaves him and Hermens sitting, unoffendingly, in a tavern until Griffith returns, *sans* shoats, but with a $100 check. Then, being one or two o'clock in the morning, with a bright and flush tomorrow to look forward to, the three of them procured a room from a not-too-discriminating hotel clerk, who "wouldn't have rented them a room if they had been drunk" but was willing to overlook that they smelled like whiskey but "no more than usual" and the fact that their clothes weren't "very clean," and retired, registered as "Hal Griffith and guests." Arousing about 8:00 A.M. on the morning of the eighteenth, their first stop was a tavern in the vicinity of the hotel for a liquid breakfast. There they found a trusting bartender willing to exchange some custom and cash for the check. En route to Hermens's home, says Davis, Griffith divided the spoils, giving him $25 and laying some currency of an unknown amount on Hermens's knee. Davis couldn't say that Hermens took it but he didn't find it in the car. After stopping at a garage to get the high gear of their car back in operation, having tired of traveling in second gear, they proceeded to Hermens's home where Sam got it over with as Mrs. Hermens "gave Sam cain for

being out all night." Sam's reaction or explanation is not in the record although there was some questioning by counsel bearing the implication that Mrs. Hermens brandished the domestic butcher knife. The principals did not regard this as serious, nor shall we. Sometime during the morning, between drinks, Griffith suggested to Davis that his car was "a sight." Davis said he drove it across the road from Hermens's home, parked it near a schoolhouse and attempted to wash it out. Apparently giving up in despair, he abandoned it there and hitched a ride to the county seat. Arriving there about noon, still "loaded," both financially and otherwise, he spent the rest of the day touring the taverns of the town, he didn't know how many but he guessed all of them. About 11:00 P.M., with his guilty conscience becoming more than the finer traits of his character could bear, he sought sanctuary at the county jail where the sheriff put him up for the night. This new association and law-abiding influence resulted in full repentance for his sins and a conscience-relieving confession signed and delivered into the hands of the sheriff on February 20. The day he testified in court was the forty-fourth day he was enjoying as the sheriff's guest.

There was other evidence offered by the State, including the stark, mute testimony of the pigs. Since these famous creatures are going to become a part of the permanent archives of this court by reason of the six beautiful photographs attached to the record of this case, and will remain here as a precedent for the guidance of all the courts and counsel in all future pig cases in this State, we should relate their further thrilling experiences after the midnight ride in the back seat of the Davis car. Their new owner, temporarily at least, was a local stock dealer and auctioneer residing in Jacksonville who apparently had no qualms about making a profitable deal late at night, so he willingly exchanged his $100 check for the nine little shoats. By coincidence he had an auction sale over at Mt. Sterling in

Brown County the following day, so he took the shoats along and found a new owner who unknowingly gave him a $62 profit on the deal. But the stock dealer hadn't permanently parted company with the little pigs that had gone to market. About a week later, their first owner and the sheriff, on the trail of the lost animals, called upon him to take them to the farm of the purchaser. And when the first owner saw that little shoat with the red ears, and when he spoke to them and they came running to him, he knew his lost prodigals had been found. Upon their return home they were photographed, in six different poses, both with and without a group of their brothers and sisters. While these photographs are not in color, to show the identifying red ears, they are not without color, dramatically. In addition to the aesthetic and artistic value which they add to the record, their evidentiary value, cursorily inconsequential, is subtly inferential. A lingering concentration, such as true art deserves, reveals that these pigs appear just as well fed and contented as their stay-at-home kin; nor is there anything in their forms, figures or faces indicating that they possess more daring or adventurous spirits. Consequently, any possible inference that they voluntarily ran away from home, either because of mistreatment or a spirit of wanderlust, is effectively dispelled.

The confusion resulting from the various terms used by the witnesses was satisfactorily cleared away when the State introduced the testimony of an experienced pig grower who stated that "swine," "hogs," "pigs" and "shoats" were all appropriate designations for these little creatures, thus legally establishing, at long last, the oft-heard profundity that "pigs is pigs."

The owner of the pigs, the sheriff, the stock dealer, the hotel clerk, and the State police officer who got wind of the Davis car and its tell-tale contents, all testified as to the parts they played and the State's Attorney rested.

The defendant called six character witnesses and definitely established, in the opinion of these witnesses, that the defendant always paid his bills. The State's Attorney, in cross-examining these witnesses, managed to get across to the jury, in spite of defense counsel's strenuous objections and the court's futile efforts to thwart it, that the defendant Sam Hermens had been in trouble with the law before.

Hermens testified in detail as to what he didn't know about any pig larceny; that he went to sleep at home about 5:00 P.M. in the afternoon of the seventeenth and awakened in a hotel room in Jacksonville on the morning of the eighteenth. Anything in between was impenetrable blackness. He denied the preliminary reconnoitering expedition, denied that he ever had any intent to commit larceny, and asserted, somewhat convincingly, that he was mentally incapable of having any intent to do anything. Mrs. Hermens denied the afternoon ride past the pig farm, never heard anyone talk about any pigs, and didn't even think her husband had spent the night in Jacksonville since he was in bed at home at 7:00 A.M. on the morning of the eighteenth. A tavern owner found Hermens too drunk about 3:00 P.M. on the seventeenth to buy a drink at his tavern, and a barmaid had him falling off a stool in a tavern where she worked in Roodhouse about 9:00 or 10:00 P.M. on the same day. Hal Griffith, testifying as a court witness at the request of defendant, claimed all the credit for locating the pigs, their asportation and conversion. Davis aided and abetted the asportation, but Hermens was at home asleep so far as he knew until he and Davis went for him after the pigs had been put to bed, and took him along to Jacksonville to do a little drinking.

The defendant tells us a great wrong has been done him by the court and jury, who should never have believed Davis's testimony. Davis, says defendant, is a tramp, a con-

fessed thief, a traitorous liar against his drinking pal to get lieniency for himself, and, worst of all, he's a drunkard. Davis admitted on cross-examination that he had just come to Illinois on February 14 to visit his brother-in-law; that he had two dollars in his pocket when he came but was broke on the seventeenth; that he had been drunk for three weeks prior to the seventeenth; and he admitted that he had pleaded guilty to this crime, had applied for probation, that this application was pending at the time and that he was "really hoping" that he would get a break from the State for his testimony against Hermens. He did—six months in the penal farm, for what offense the record doesn't show, as contrasted with the three to five years in the penitentiary meted out to his two trusting pals. Defendant further complains that he was not given sufficient time to prepare for trial, the court erred in instructing the jury as to the defense of drunkenness and the court erred in permitting the State's Attorney to cross-examine the character witnesses as to other dishonest acts.

The State contends Davis's testimony was corroborated in many details by Griffith, by the hotel clerk and by the circumstance of Hermens's knowledge of the farm where the pigs were stolen and the lack of such knowledge in Davis and Griffith. As to the actual act of the larceny, however, Davis's testimony stands alone. But the State says the jury knew Davis was an accomplice, knew of his pending application for probation, saw and observed the witnesses as they testified and was justified in believing his testimony even if it was uncorroborated.

As we view this evidence, there was no reliable corroboration of Davis's testimony that Hermens participated in this larceny other than the inferences which might be drawn from the relative knowledge of the parties involved. The testimony of the hotel clerk is not impressive. He said the three men's clothing was dirty, and that Davis and Hermens were dirtier than Griffith, who admittedly handled

the hogs twice, in loading and unloading them. The clerk further qualified his statement by saying Davis and Hermens were dirtier because they were dressed in coveralls while Griffith was not. Hermens explained the clerk's testimony that they were dirty, saying "Well maybe he thinks clothes like I wear is dirty around a hotel." The mere statement that their clothes were dirty, with no description of the degree or nature of the dirt, and no testimony of mud or odor does not corroborate testimony that Hermens had handled these hogs.

At common law the uncorroborated testimony of an alleged accomplice was sufficient to warrant a conviction if it satisfied the jury beyond a reasonable doubt. This rule has always been followed and has frequently been pronounced in Illinois. (*People* v. *Dabbs*, 370 Ill. 378; *People* v. *Cohen*, 376 Ill. 382; and see numerous citations 22 C.J.S., page 1389.) It is, however, universally recognized that such testimony has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution, which must always be taken into consideration. Some jurisdictions attach such weight to these weaknesses that the rule has been abrogated by statute (22 C.J.S. 1391) while those jurisdictions which follow the rule, recognizing the questionable character of such testimony, attempt to restrict the weight to be given to it by statements that it is not regarded with favor, is discredited by the law, should be weighed with care, is subject to grave suspicion, should be viewed with distrust, and that it should be scrutinized carefully and acted upon with caution. (*People* v. *Gleitsmann*, 361 Ill. 165; *People* v. *De Rose*, 359 Ill. 512; *People* v. *Kendall*, 357 Ill. 448; *People* v. *La Coco*, 406 Ill. 303.) Other similar statements by this court are too numerous to be cited. This court has also said that where it appears that the witness has hopes

of reward from the prosecution, his testimony should not be accepted unless it carries with it absolute conviction of its truth. *People v. Grove,* 284 Ill. 429.

It is therefore apparent, from the regard of the courts for this type of evidence, that material corroboration or direct contradiction are entitled to considerable weight. In the instant case we have found no direct corroboration of Davis's testimony connecting defendant with the larceny, but we do have the positive testimony of another accomplice and the defendant that he did not participate in the crime. In *People v. Harvey,* 321 Ill. 361, we said the testimony of the accused was entitled to as much weight as that of an accusing accomplice, and where other accomplices supported defendant's denial the defendant's guilt was not established beyond a reasonable doubt. We have also said that we will not hesitate to reverse a conviction based upon the testimony of an accomplice when that testimony lacks material corroboration or is discredited by other credible evidence. *People v. Rendas,* 366 Ill. 385; *People v. Hudson,* 341 Ill. 187; *People v. Ravenscroft,* 325 Ill. 225.

The defendant further complains that reversible error was committed by the State's Attorney in cross-examining the defendant's character witnesses as to their personal knowledge of particular acts of bad conduct of the accused. One witness was asked "Are you familiar with any reputation of this man as to commitment of dishonest acts?" Another was asked "Did you ever hear about his being in trouble with the law before?" Another witness was questioned about defendant's reputation "for doing dishonest acts," and elicited the response of the witness "I heard he done some dishonest acts." Although this answer was stricken by the court the State's Attorney again asked the witness if defendant's "reputation for doing dishonest acts was good or bad." Defendant's objection was overruled and the witness replied "He's been in trouble before but I don't know what for."

The State admits in its brief that this type of cross-examination was "inept" and "partially erroneous" but is not reversible error. We think otherwise. Whether the witness knows that defendant had committed any previous dishonest acts or been in trouble with the law before would not tend to prove his guilt or innocence of the crime charged nor are they proper questions to impeach his general reputation. In *People* v. *Page,* 365 Ill. 524, a character witness was asked if he didn't know that defendant had been having trouble in the past and did he ever hear of defendant being arrested. In reversing the conviction because of these questions we stated "neither on cross-examination nor in rebuttal of proof of good character can particular acts of misconduct be shown. [Citations.] * * * We have often condemned the practice, in criminal cases, of asking improper questions for the purpose of creating in the minds of the jury a prejudice against the defendant, and judgments of conviction have been reversed for such conduct. [Citations.] We cannot say that defendant was not prejudiced by attempts to show that he was a quarrelsome individual, who had been arrested and had had previous trouble with trespassers on his land."

Under the circumstances of this case, where the jury had the difficult question of choosing between the testimony of Davis and that of Griffith and defendant, we think that eliciting from the character witnesses such statements as "I heard he done some dishonest acts" and "He's been in trouble before but I don't know what for" were highly prejudicial and may have influenced the jury in reaching their verdict of guilty.

Because the testimony of the accomplice Davis lacks material corroboration, is denied by the defendant and another accomplice whose testimony is not such as to be unworthy of belief, and because of the prejudicial statements about other offenses, we are not satisfied that defendant's guilt has been established beyond a reasonable

doubt. The judgment is reversed and the cause is remanded for a new trial.

Having reached this conclusion we deem it unnecessary to consider the other assigned errors.

*Reversed and remanded.*