THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNY PRICE, Defendant-Appellant.

(No. 56281;

First District (2nd Division)—June 28, 1974.

*Rehearing denied August 26, 1974.*

Charles A. Boyle, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Jonathan Gilbert, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE HAYES delivered the opinion of the court:

On the night of 17 February 1970, a number of men broke into the apartment of Albert and Clara Jenkins. Mr. Jenkins was not at home at the time; however, Mrs. Jenkins was present and was beaten by one of the intruders; she died, as a result, 3 days later.

On 21 May 1970, Lee Arthur Hodges, Johnny Price, and Melvin Battie were jointly indicted under indictment number 70-1408 for the murder of Clara Jenkins (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)2, 9—1(a)3). On 20 April 1971, Johnny Price (hereafter defendant) was severed from his co-indictees for trial. After a bench trial, a jury having been waived, defendant was found guilty of murder and sentenced to imprisonment for a term of years not less than 30 nor more than 60. Defendant appeals that conviction.

Defendant's first contention on appeal is that the testimony of the accomplice witnesses (Hodges and Battie) was uncorroborated, discredited, and contradicted, and, therefore, did not establish his guilt beyond a reasonable doubt. In order to consider this contention, it is necessary to examine all the evidence adduced at the defendant's trial.

Lee Arthur Hodges, defendant's co-indictee, testified for the State. He indicated that, in exchange for his testimony, he would be allowed to plead guilty to a lesser offense than murder. Hodges' narrative started at 11 A.M. on 17 February 1970. At that time he went to a grocery store on Roosevelt Road at California Avenue (2800 West) with his cousin, Melvin Battie, the other co-indictee who also testified for the State. There Hodges met defendant, who stated that he needed help to "rip off" a place and who threatened Hodges physically if he did not promise to help. Hodges testified that he refused because, at that time, he was on parole from St. Charles School for Boys. The witness then left the store, but stated that he had to return a short time later because he had forgotten to buy a newspaper. Again defendant allegedly threatened him, saying that he and some other boys would "get" him. Hodges testified that he believed defendant to be a member of the Vice Lords street gang, and that these were probably the boys to whom defendant was referring. At 11 P.M. that night, Hodges and Battie again returned to the

grocery store to buy some T.V. snacks, and they again encountered defendant. This time defendant followed the cousins home, again asking for their assistance. When the witness again refused, defendant allegedly pulled a knife on him, grabbed him by the collar, and held the knife to his throat. Defendant again threatened the witness, if the witness did not agree to help him. After discussing the problem with his cousin, Hodges testified that he agreed to help defendant, since he feared for the safety of his mother and sisters. Hodges then accompanied defendant, along with Battie, to 1219 Washtenaw Street (2700 West and just South of Roosevelt Road, and the address of the Jenkins apartment). He waited outside while defendant and Battie went up the stairs. Defendant knocked on the door of the Jenkins apartment, stating that he was looking for a Mr. Jenkins. According to Hodges, when defendant found that Jenkins was not there, defendant kicked in the door. At this juncture, Hodges ran from the scene to tell his mother (who, with Hodges, lived across the street), but went back out of fear of what defendant might do to his cousin, Battie. When he returned, defendant and Battie were calling him. According to the witness, defendant had a lady on the bed with a coat over her face. Hodges stated that he grabbed a small T.V. set from the bedroom and joined his cousin in the living room, who was working on a larger T.V. set. He put his small set on the larger set, and both men together carried the two sets down the stairs and out of the building. Hodges stated that they called to defendant before they left the building, but that he did not answer. They stored the T.V. sets in a vacant apartment in Hodges' mother's building, on the floor above the mother's apartment. Twenty or 30 minutes later, defendant allegedly arrived in the Hodges' kitchen with blood on his sleeve. According to Hodges, when he asked about the blood, defendant answered that he had to "keep her quiet" and gave the same response to Battie upon Battie's subsequent inquiry. At this point defendant allegedly warned Hodges that he would "fuck him up" if he (Hodges) "tricked on him." Hodges then stated that, on the following day, he sold the two television sets. Finally, he testified that, when he was arrested, he had failed to tell investigating Detective Sandberg about how defendant had threatened him.

On cross-examination, Hodges stated that he had been in the Jenkins apartment before the night of the incident. In fact, Hodges admitted that he had originally sold one of the stolen T.V. sets to Mr. Jenkins. He in turn had originally purchased it from a "dope fiend." The witness stated that he and Battie split the $70 received from the resale of the T.V. sets; and he admitted that he was unemployed at the time of the incident. Hodges stated that he had never been to the victim's apartment. Finally,

for some unknown reason, the witness contradicted his own direct testimony and stated expressly that he had been promised nothing for his testimony.

The next State witness was Melvin Battie, the other co-indictee and the cousin of Lee Arthur Hodges. He also related that he was to be allowed to plead guilty to the lesser offense of armed robbery in exchange for his testimony. As with his cousin, Battie's narrative of the events of 17 February 1970 began at 11 A.M. outside the grocery store on Roosevelt Road. At that time, he and his cousin met defendant, and Hodges had a conversation with him which the witness was unable to hear. The witness stated that he and his cousin returned to the store five minutes later and, again, Hodges and defendant had a conversation which the witness could not hear. After spending the day in unrelated activities, the two cousins again returned to the same grocery store at 11:30 P.M. Upon leaving, they were allegedly followed by defendant, who asked Hodges if he was "going to help him do that", to which Hodges responded "no". The witness stated that defendant then pushed Hodges into a hallway, pulled a knife on him, and grabbed him by the collar. Hodges then approached the witness and stated that defendant had threatened to shoot up his (Hodges') house and burn it down if Hodges did not help him rob a certain place. The witness stated that he thought they should help defendant with the robbery, since, in Hodges' opinion, defendant was serious about his threats. Battie then stated that he and his cousin accompanied defendant to the Jenkins apartment; that defendant kicked down the door after Mrs. Jenkins stated that her husband was not at home; that Hodges was acting as a look-out down the stairs; that they had to call two or three times before he came up the stairs; that they went into the apartment, and Hodges took a small T.V. set from the victim's bedroom while he (the witness) grabbed a larger one from the living room; that he and Hodges called for defendant as they were leaving, but defendant did not answer; and that he and his cousin then stored the T.V. sets in a vacant apartment in his cousin's building. According to Battie, defendant arrived in the Hodges' kitchen 30 minutes later with blood on his sleeve and a knife in his hand. The witness stated that, when he inquired about the blood, defendant stated to him that he (defendant) had to hit the lady to "keep her quiet", and defendant then threatened both him and his cousin if they said anything.

Under cross-examination, Battie admitted that he was also known by the name of Henry Jones, and he stated that he had never been to defendant's house, and he did not recall his cousin borrowing a pair of pants from defendant. He stated that he was outside the hallway when defendant threatened his cousin in the hallway before the incident, and

that he himself had not been threatened but went along because he did not want to see Hodges' mother (his aunt) get hurt. The witness stated that defendant had held Mrs. Jenkins down on the bed with a coat over her head. He finally stated that he and his cousin shared in the proceeds of the sale of the stolen T.V. sets, and defendant got nothing.

Albert Jenkins, the victim's husband, was called as a life and death witness by the State. According to his testimony, he left for work on the afternoon of 17 February 1970 and returned home at 3:30 A.M. on 18 February 1970. At that time he discovered his wife lying on the floor, her face swollen, her eyes closed, and able to speak only in a mumble. She was taken to a hospital and died 3 days later. When he examined the apartment, he discovered that two radios and two T.V. sets were missing.

Under cross-examination, it was revealed that Mrs. Jenkins was crippled and wore a brace at the time of the incident. Mr. Jenkins stated that Hodges lived across the street from him and had been over to his home four or five times trying to sell him different things. He also indicated that Hodges was aware of the time at which he usually left for work. Finally, Mr. Jenkins stated that he had never seen defendant prior to defendant's arrest.

Detective Richard Sandberg, a Chicago police officer assigned to investigate the murder of Clara Jenkins, testified that in his investigation he had questioned Lee Arthur Hodges. Hodges had made a statement to him in which he had implicated defendant, but had failed to mention that defendant had threatened him with a knife prior to the incident. Through Hodges' statement, he was also able to recover the two television sets which Hodges, Battie, and Mr. Jenkins all identified as the ones which were taken in the robbery of the Jenkins apartment.

There was a stipulation that the cause of death was a traumatic subarachnoid cerebral hemorrhage, after which the State rested its case.

Annie Allen, defendant's sister, testified on behalf of her brother. She stated that defendant had returned home from work around 6 P.M. on 17 February 1970. A short while later, Hodges and Battie had come over to borrow some pants. The witness stated that John Price, Sr., defendant's father, and one Billy Carton were also present. At 7 P.M., Carton, Hodges, Battie, and defendant had left the house together. At 10:00 P.M., defendant had returned home with Carton, who was intoxicated. At this time the witness' husband and father were present. Sometime before 11 P.M., defendant went to bed and did not leave home for the rest of that night. According to the witness, at midnight, Hodges and Battie reappeared; her father was present at this time. She stated that she had fixed them something to eat, but had had no conversation with them. They left a short while later.

John Price, Sr., defendant's father, testified on behalf of his son. He stated that his son went to work the morning of 17 February 1970 and returned home at dinner time that evening. Soon afterward, Hodges and Battie appeared to borrow some pants, and left a short time later. The witness stated that his son and Billy Carton left also, but he was not sure that they left with Battie and Hodges. At any rate, defendant returned home at 9:30 or 10 P.M. along with Billy Carton, who was intoxicated. Defendant retired a short time later and the witness retired a short time after that. The witness did not substantiate his daughter's account of Hodges' and Battie's midnight visit.

Defendant, Johnny Price, testified on his own behalf. He stated that he had been in the Army and had received an honorable discharge because of a speech impediment. On the day of 17 February 1970, he stated that, at 8 A.M., he left for work at General Metals, where he was a metal sorter; that, prior to the time he had been in the Army, he had punched a time card, but, since his discharge, he had been paid from his boss' pocket; that on the day of the 17th he rode on a scrap truck with one Nathan Smith; that he worked with Smith until 4:30 P.M., stopping only for lunch at Roosevelt Road and Central Park Avenue (3600 West, and therefore 1 mile west of the grocery store at California Avenue); that, after work, he walked to Roosevelt Road and California Avenue with Smith and then went home at 6 P.M. According to defendant, Billy Carton came over a short time later, and, about 6:15 P.M., Hodges and Battie came over to borrow some pants. After talking for about a half hour, the defendant stated that he, Carton, Hodges, and Battie all walked to a grocery store at the corner of Roosevelt Road and California Avenue. The group remained at the grocery store until 8:45 P.M., at which time Carton departed for a tavern, and defendant walked Hodges and Battie to Hodges' home so that Hodges could drop off the pants that he had borrowed. By this time, it was 9 P.M. and defendant stated that Hodges informed his mother that he (Hodges) was going back to Roosevelt Road. Upon leaving the Hodges' home, Hodges and Battie walked by themselves across Washtenaw Avenue, surprising defendant, since this was not the direction from which they all had come. Defendant testified that he asked them where they were going and how long they would be gone; they answered that they were going "across the street" and that they would be "right on back." Defendant allegedly waited 15 minutes in front of the Hodges' apartment building for the two cousins to return and then gave up, returning by himself to Roosevelt Road and California Avenue where he re-joined Billy Carton. He later saw Hodges and Battie at around 10 P.M. as he was leaving a tavern with Carton, but

he testified that he had no conversation with them. Defendant stated that he then returned home, had something to eat, and went to bed around 10:35 P.M. Defendant further testified that he met Hodges the next day, and Hodges asked him if he would like to buy a television set that he and his cousin had gotten from "an apartment" the night before; and, when defendant told Hodges that he was not interested in buying the television set, Hodges asked him if he would store "them" so that his (Hodges') parents would not find out about them. Defendant declined, and Hodges then allegedly threatened defendant if he would say anything. Defendant testified that he reacted to the threat by throwing Hodges up against a wall and warning him never to threaten him again. Finally, defendant testified that he had never met Mr. Jenkins before a bond hearing held in connection with the present case.

Nathan Smith testified for the defense. He stated that he had known defendant for four years. He testified that he was a truck driver for General Metals and that defendant sometimes rode with him on the truck. On 17 February 1970, defendant did ride the truck with the witness. At noon time, they stopped for lunch at Central Park Avenue and Roosevelt Road. The witness stated that he "brought a bottle". They both worked until 4:30 P.M. Mr. Smith stated that defendant was with him all day.

Norman Varon, the owner of General Metals, and Sam Amalinsky, defendant's foreman, both testified concerning the good general reputation for truth and veracity that defendant had in the community in which he lived and worked. Both witnesses alluded to defendant's speech impediment, which sometimes made it hard for them to understand defendant.

The State called one Joe Anthony in rebuttal. He stated he was living with Mrs. Hodges (Lee Arthur Hodges' mother) at the time of the incident. At 12 or 12:10 A.M. on the morning of 18 February 1970, defendant, Hodges, and Battie were in the Hodges' kitchen. He was in a bedroom next to the kitchen and overheard a conversation among the three. Price allegedly said: "Somebody is going to talk and I can't afford to be locked up". Battie responded: "No day like this, give me the knife". According to the witness, defendant was wearing a blue jacket and blue pants.

Under cross-examination, Mr. Anthony stated that he had been living in the Hodges' home for about a year at the time of the incident and was sort of a father to the Hodges' children; in fact, three of the children were actually his. He stated that he remembered the incident because it was a time when Melvin Battie was staying with the Hodgeses. Mr. Anthony could not remember what Hodges, Battie, or Mrs. Hodges was wearing at the time of the kitchen conversation.

OPINION

The State's case rests on the testimony of Hodges and Battie. Mr. Anthony contributed corroboration as to one event in the chain of events related by Hodges and Battie. It was Hodges who first implicated defendant to investigating Officer Sandberg. The testimony of Mr. Jenkins points to Hodges and away from defendant as the likely conceiver and planner of the incident. This case, therefore, is one in which defendant has been convicted solely upon the practically uncorroborated testimony of two accomplice witnesses, each of whom was promised leniency by the State in return for his testimony. Of the two, Hodges emerges as the leader and Battie as the follower.

I

Hodges testified that he had met defendant in a store in the 2700 block of Roosevelt Road some time around 11 A.M. the morning of the incident, and that defendant threatened him if he did not promise to help "rip off" a certain place. Battie substantiated the fact of the meeting, but he admitted that he did not hear the conversation between Hodges and the defendant. Defendant, on the other hand, stated that he had worked all day and had not been near that store. This testimony was substantiated by Nathan Smith, who stated that he had worked with the defendant all day, and by the defendant's father and sister, both of whom stated that the defendant had gone to work on the 17th.

Hodges and Battie testified that the next time they had seen defendant was at 11 or 11:30 P.M. in the same store in which they had seen him 12 hours earlier. Defendant, his father, and his sister all testified that Hodges and Battie had come to the Price home shortly after 6 P.M., and just after defendant had arrived home from work; that Hodges had borrowed some pants; that defendant, Hodges, Battie, and Billy Carton had left the Price home a short while later; and that defendant had returned home at 10 P.M. and had retired about a half-hour later for the rest of the night.

II

We think that there are inconsistencies and improbabilities in the testimony of both Hodges and Battie which raise a reasonable doubt as to their veracity.

The knife which defendant allegedly carried on the night of the incident was a central element in the testimony of both Battie and Hodges. However, in his statement to Detective Sandberg, Hodges failed to mention that defendant had used a knife with which to threaten Hodges in

order to induce him to help in the contemplated robbery. It seems strange also that, while defendant allegedly was brandishing a knife both before and after the incident, a knife was not used on the victim. Indeed, it seems that it would have been simpler for defendant to "keep her quiet" with the threat or thrust of a knife than to struggle with her to the point where he was not able to participate in the actual robbery which he allegedly planned.

Again, both Hodges and Battie stated that defendant had blood on his clothes when he appeared in the Hodges' kitchen after the incident. However, Albert Jenkins, the victim's husband, stated that, when he found his wife, her face was swollen and her eyes were closed; he did not mention the presence of any blood. In addition it was stipulated by both the prosecution and the defense that the cause of death was a "traumatic subarachnoid cerebral hemorrhage", a condition which, by definition, is not necessarily accompanied by external bleeding.

Again, while Hodges and Battie purported to account for their participation in the incident on the sole basis of alleged threats by defendant and on their fear of him, they both felt free on the very next day to dispose of the T.V. sets taken in the robbery without giving defendant any part of the proceeds. Nor did they testify to any subsequent reaction on the part of the defendant. It is simply incredible that the alleged initiator and planner of the robbery, who allegedly took the trouble to coerce Hodges and Battie into participating in it and who is not alleged himself to have taken anything from the Jenkins apartment, should then, at the alleged kitchen meeting immediately after the robbery, have shown no interest whatever in the nature of the loot from the robbery or in the present whereabouts of the loot or in its subsequent disposition and the division of the proceeds.

Again, defendant, who allegedly planned the robbery, had never been to the victim's apartment, according to Albert Jenkins, the victim's husband. In fact, Jenkins stated that he had never seen the defendant prior to his arrest. However, Jenkins stated that Hodges lived across the street from him; he also stated that Hodges had been to his apartment many times and knew the time at which he left for work every day. Hodges himself admitted, under cross-examination, that he had originally sold Jenkins one of the two television sets which he had stolen the night of the robbery. Hodges' proximity and familiarity with the victim's apartment, coupled with his unemployment, indicate to us a good opportunity and motive to plan the robbery. By the same token, defendant's unfamiliarity with the apartment and the neighborhood and his steady employment demonstrate little opportunity or motive.

## III

In addition to the foregoing infirmities, we are confronted in this case with the ever-nagging problem of the weight which is to be accorded to the uncorroborated testimony of accomplice witnesses, who have been promised leniency by the State in return for their testimony. Our reservations regarding this type of testimony are well stated in *People v. Hermens* (1955), 5 Ill.2d 277, 285-286, 125 N.E.2d 500:

> "At common law the uncorroborated testimony of an alleged accomplice was sufficient to warrant a conviction if it satisfied the jury beyond a reasonable doubt. This rule has always been followed and has frequently been pronounced in Illinois. [Citations.] It is, however, universally recognized that such testimony has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution, which must always be taken into consideration. Some jurisdictions attach such weight to these weaknesses that the rule had been abrogated by statute [Citation] while those jurisdictions which follow the rule, recognizing the questionable character of such testimony, attempt to restrict the weight to be given to it by statements that it is not regarded with favor, is discredited by the law, should be weighed with care, is subject to grave suspicion, should be viewed with distrust, and that it should be scrutinized carefully and acted upon with caution. [Citations.] Other similar statements by this court are too numerous to be cited. This court has also said that where it appears that the witness has hopes of reward from the prosecution, his testimony should not be accepted unless it carries with it absolute conviction of its truth."

Reward from the prosecution is a significant factor in the present case. Battie testified that his indictment for murder would be dropped and that he would be allowed to plead guilty to the lesser charge of armed robbery in exchange for his testimony against the defendant. Hodges stated on direct examination that he was to be allowed to plead guilty to a lesser charge than murder in exchange for his testimony against the defendant. Later, under cross-examination, he stated that he had not been promised anything. This self-contradiction further undermines his testimony.

■■ In addition to considering the potential rewards offered to uncorroborated accomplice witnesses for their testimony, it is always necessary for the trier of fact, as well as for a reviewing court, to consider the

*comparative backgrounds* of the accused and of his accusers in determining what weight is to be accorded to that testimony. *People v. Hansen* (1963), 28 Ill.2d 322, 192 N.E.2d 359; *People v. Mostafa* (1971), 5 Ill.App.3d 158, 274 N.E.2d 846.

Both Hodges and Battie admitted taking part in the robbery of the Jenkins apartment, stealing two television sets and dividing the proceeds from the sale of those sets between themselves. Both witnesses were unemployed and, in addition, Hodges was on parole at that time. Hodges also admitted not telling the police "all the truth."

■■ Defendant, on the other hand, was married and was the father of a child. He had been employed intermittently by the same company for 4 years. He served 5 months in the U.S. Army, from which he had received an honorable discharge for a speech impediment. Both his employer and his foreman testified that they had known defendant for 4 years and that his general reputation for truth and veracity in the community in which he lived and worked was good. Admittedly these men did not live in the same neighborhood as the defendant; however, their place of employment was less than two blocks from the defendant's home, and they did know and work with the defendant for 4 years. Considering these facts we feel that the proof showed defendant to be a respectable and law abiding citizen. This conclusion is borne out by the assistant State's attorney's comment during the hearing in aggravation and mitigation: "* * * the defendant has no criminal background." Utmost caution must be used in relying on uncorroborated accomplice testimony, especially where the witnesses are self-confessed and discredited criminals who have been offered a reward for their testimony, and the proof shows that the accused is a respectable and law abiding citizen. (*People v. Hansen, supra; People v. Mostafa, supra.*) This same caution governs our review of the case. And, although the weaknesses of accomplice testimony go to the weight of the evidence and to the credibility of the witnesses, matters peculiarly within the province of the trier of fact in the first instance, we will not hestitate to reverse the finding of a jury or a trial court where the conviction was based on uncorroborated accomplice testimony and where, in reviewing that testimony with regard to its nature and its source and its potential motivation, we are left, as we are in this case, with a reasonable doubt as to defendant's guilt. (See *People v. Mostafa, supra.*) The applicable general principle has been stated by our supreme court as follows: "* * * in criminal cases it is the duty of this court to review the evidence, and, if there is not sufficient credible evidence, or if it is improbable or unsatisfactory, or not sufficient to remove all reasonable doubt of defendant's guilt and create an abiding conviction that he is guilty, the con-

viction will be reversed." *People v. Dougard* (1959), 16 Ill.2d 603, 607, 158 N.E.2d 596; see also *People v. Newson* (1971), 133 Ill.App.2d 511, 273 N.E.2d 478.

■■ We are not unmindful of the testimony of the State's rebuttal witness, Joe Anthony. His was the only testimony that tended to corroborate the testimony of Hodges and Battie. Considering, however, the narrow area of corroboration (facts occurring after the robbery), his impeachment by defense counsel, and his admitted fatherly ties with Hodges, we find that his testimony is not significantly corroborative and leaves Hodges' and Battie's testimony standing naked and unsupported, insufficient to persuade us of the defendant's guilt beyond a reasonable doubt.

The judgment is, therefore, reversed for the foregoing reasons. Since we have arrived at this decision, we find it unnecessary to consider the other points raised in this appeal.

Reversed.

STAMOS and LEIGHTON, JJ., concur.