THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DORAN R. BENNETT, Defendant-Appellant.

Fifth District    No. 79-128

Opinion filed October 16, 1980.

John H. Reid and Jeff M. Plesko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

K. Rick Keller, State's Attorney, of Effingham (Martin N. Ashley and Raymond F. Buckley, Jr., both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mme JUSTICE SPOMER delivered the opinion of the court:

The defendant, Doran R. Bennett, was charged by information with armed robbery. Following a jury trial, he was found guilty and sentenced to 10 years' imprisonment. He appeals from his conviction and sentence.

Defendant raises five issues on appeal: that he was not proved guilty beyond a reasonable doubt where his conviction rested on uncorroborated accomplice testimony; that he was prejudiced when twice forced to appear before the jury in handcuffs; that he was prejudiced by discussion among the jurors of his failure to testify; that he was denied effective assistance of counsel where his attorney was subject to a conflict of interest; and that his sentence was excessive.

The record reveals that an armed robbery of D.J.'s Party Supply occurred on July 9, 1978. Two days thereafter, defendant was charged with that offense, after a co-defendant, Joseph Lawrence, was arrested and made a statement implicating him. The statement was made to

Detective John Lange of the Effingham police department, who was the sole witness testifying at the preliminary hearing. Both defendant and Lawrence were represented by the same attorney at this time.

The trial began on November 8, 1978, the 120th day following defendant's arrest. Prior thereto, the trial was continued several times because of the State's inability to locate two witnesses, Helen Cline and Ruby Neeley. On the day of the trial defendant filed a petition for imposition of sanctions, asking that these witnesses not be allowed to testify since the State had failed to provide their addresses or telephone numbers to the defense. The State contended that Detective Lange was unable to locate them until two days prior to trial, but that their testimony would be consistent with their prior statements previously furnished to defendant. Cline was present when trial commenced and available for interviewing, and the State indicated that Neeley would be present later during the trial. Although the court was willing to grant defendant a short continuance to interview the witnesses, defendant declined, and the trial commenced.

The State presented several witnesses. Bob Devall, the clerk at the liquor store, testified that he was robbed about 10:30 p.m. on July 9. The robber, a white man, wore a stocking mask which covered his head down to his upper lip. Devall gave the man money from the cash register and a red cigar box containing pennies. He identified the box in court. He also identified a mask which resembled that worn by the robber and a gun which looked like that used in the robbery. Devall testified that the robber had a two- or three-day beard growth, and that he stood in a crouched position.

Detective Lange testified that on the night of the offense, because of a tip received that a robbery was to occur there, he and his supervisor had the store under surveillance. He was at the rear of the store in a vehicle, and the supervisor was parked across the street in front of the building. At about 10:30 p.m. a white 1968 Dodge Coronet pulled into the laundromat parking lot next to the liquor store. A male Caucasian got out of the driver's side, opened the trunk, entered the rear of the car, and then disappeared from view. When he returned to the car, he entered the passenger side. Detective Lange reported the license plate number to the other officer, and his inquiry revealed the car was registered to the defendant. Both cars gave chase, with Lange noting that the driver was a black male. Lange testified that during the chase the passenger in the Dodge threw several items out of the windows. The officers lost sight of the Dodge and returned to search along the highway. They found a cigar box, money taken in the robbery, a gun, and a paper sack.

Joseph Lawrence testified that he resided in Indianapolis, Indiana, and that he saw the defendant on the day of the offense, July 9, 1978. The

defendant drove up to his house about 9 a.m. in his 1968 Dodge. The two proceeded to the house of Louis Batson, with whom they then went out drinking, accompanied by an old man whom Lawrence had never seen before. On this trip the defendant had a gun and holster, which resembled exhibits entered into evidence.

Later, the defendant and Lawrence dropped off the unidentified man and Batson, and went to Ruby Neeley's house in Dieterich, Illinois, where they stayed for about three hours and drank a few beers. They left about 9 p.m., prior to which defendant changed into a striped shirt and striped pants. Lawrence stated that a State exhibit looked like the shirt defendant had worn, but another exhibit was not the pants defendant had been wearing.

Defendant drove Lawrence to Effingham, Illinois, where defendant stopped in the parking lot of a laundromat, next to a liquor store. The defendant got out and opened the trunk. Lawrence knew defendant had a gun and that both the gun and the beer were in the trunk. Defendant then went into the liquor store. He returned in about two minutes with a paper bag, and had a gun in his hand. He asked Lawrence to drive. When Lawrence saw a police car behind them, the defendant admitted that he had robbed the liquor store. Lawrence sped up and lost the police. The men abandoned the defendant's car, and each went his separate way. Lawrence was apprehended a short time later.

Louis Batson, who lived in Clinton, Indiana, testified that on the day of the offense he was visited by Joe Lawrence, whom he knew, and defendant and an old man, whom he did not know. The group left together in defendant's white 1968 Coronet to go drinking. Batson identified a gun and holster in evidence as similar to those defendant had the day of the robbery, and said that defendant had twice shot the gun into the air.

Helen Burns, formerly Helen Cline, testified that on the day of the offense she lived in Dieterich, Illinois, with Ruby Neeley. On that day she saw the defendant and Joe Lawrence at her trailer. They had arrived in defendant's car about 8 or 8:30 p.m. and left between 9 and 10 p.m. When Helen saw the defendant the next day, he told her that his car had been wrecked in Effingham. She identified the holster in evidence as one she had seen in defendant's car.

Denise Neilson, a technician with the Illinois Bureau of Scientific Services, testified that the hair collected from a comb recovered in the defendant's car was similar in color and microscopic characteristics to a sample of defendant's hair.

As witnesses for the defense, Connie and Bill Brooker of West Terre Haute, Indiana, and their 15-year-old son, Todd, testified. Defendant was arrested in front of their house on the day after the robbery. Todd, who testified that he knew defendant well, said that sometime after noon they

fed defendant a sandwich and lent him a razor to shave. Todd thought defendant had no more than a one-day beard growth.

Howard Reynolds, also of West Terre Haute, testified that he and defendant were together on July 9 at defendant's apartment or Reynolds' home, from 8:30 or 9 a.m. until 3 or 4 in the afternoon. During that time defendant did not have a gun.

Paul Reynolds, also of West Terre Haute, testified that he was with defendant before dark on the night before he was arrested. On cross-examination, however, he was not sure whether it was July 9 or the day before.

The defense also called Detective Lange, who identified the car title to the 1968 Dodge, which was registered in defendant's name. Lange obtained this document from Ruby Neeley, who reported to the police the day following the crime that the car belonged to her and that it had been stolen. The title was signed on the back by the defendant, but no name appeared on the line provided for a buyer.

The record reveals that Joseph Lawrence was originally charged with accountability armed robbery after his arrest. Following 68 days in jail, Lawrence pleaded guilty to an unrelated charge of criminal trespass to a motor vehicle. At that time the armed robbery charge was dropped. At trial he contended that he was not promised dismissal of the charge in return for his testimony against defendant. The defense called Marlin Worton, a jail cellmate of Lawrence, who testified that Lawrence had struck and intimidated him while both were in the county jail.

Following the presentation of evidence, the defendant was found guilty. On December 8, 1978, he filed a motion in arrest of judgment and a motion for new trial. Among matters alleged as grounds for a new trial was ineffective assistance of counsel. Defendant had sent several letters to the judge complaining of the representation he received, and copies of the letters were attached to the motion. At the hearing, counsel pointed out the apparent conflict he faced in arguing his own incompetency. The following colloquy ensued:

"THE COURT: I want to be sure, first, Mr. Bennett understands the position he is in and want it to be clear if you are willing to proceed with Mr. Stasiulis representing you?

DEFENDANT: Yes, I will.

THE COURT: And as I indicated, I don't feel he can argue in regard to your claim that he did not competently represent you at the trial.

DEFENDANT: Yes.

THE COURT: Do you wish to present that argument yourself?

DEFENDANT: No, I'll let him.

\* \* \*

THE COURT: I see the problem and this concerns me greatly. I'm sure that Mr. Stasiulis cannot argue the motion that has been made by the Defendant, himself. But, I'd like to state I am concerned about him arguing the motion that he has filed. Is it your desire to have another attorney appointed to represent you at this stage of the game?

DEFENDANT: No, I think I'll let Stan.

THE COURT: You understand that they can use this criticism of him for his actions in the trial. Your are sitting in open court now advising me that you are satisfied with what Mr. Stasiulis has done and I don't want you waiving any of your rights?

DEFENDANT: I don't know that much about the law. I wouldn't even know the words to say or nothing about it, see.

THE COURT: The Court's feeling in regard to this is I either have to appoint an Attorney for him to handle the rest of the case, Mr. Stasiulis' motion and his motion and everybody else's motion or I have to permit him to argue his motion on his own. I don't think I can appoint an Attorney to come in here and present an argument in regard to what Mr. Bennett has filed which attacks Mr. Stasiulis' ability. I think it has to be one way or the other. He has got to argue it or I have to appoint him another Attorney in the whole proceeding and relieve Mr. Stasiulis. Mr. Bennett, you have heard and is it your desire to proceed with Mr. Stasiulis or request the Court at this time to appoint an Attorney to represent you in regard to all these matters?

DEFENDANT: I'll just go ahead and keep Stan.

THE COURT: It is your desire and you understand the position it is putting you in?

DEFENDANT: Yes.

THE COURT: All right. I'll go ahead and hear it and Mr. Bennett will be permitted to present his portion of the motion. Do you wish to present anything in regard to that motion? Stan cannot be of much assistance to you because in your motion you have attacked his ability. Do you wish to present an argument to the Court?

DEFENDANT: No."

Defense counsel then went on to argue the remaining assertions in the motion for a new trial, which was denied by the trial judge.

On December 18, 1978, in response to an objection by defendant, the trial court ordered that certain police and F.B.I. reports be excised from the presentence report. A sentencing hearing was held on January 19, 1979, at which time the reports remained in the presentence report. Defendant's further objection was overruled. As evidence in aggravation,

Detective John Lange testified that he heard a gunshot while pursuing defendant following the robbery, and later recovered a gun he believed had been thrown from defendant's car window.

Defense counsel then requested that the court give consideration to the sentence received by co-defendant, Joseph Lawrence, and brought to the court's attention certified copies of Indiana charges of which defendant was found not guilty. Counsel also advised the judge, through testimony of the prosecutor, that the State had agreed during plea negotiations to recommend a four-year sentence if defendant would plead guilty to the reduced charge of robbery.

The court found that the defendant's conduct caused no physical harm, but that he had a history of criminal activity and that the sentence was necessary for deterrence, and sentenced the defendant to 10 years' imprisonment.

Defendant's first argument on appeal is that he was not proved guilty beyond a reasonable doubt. He argues that the only evidence the State presented which linked defendant to the armed robbery was the testimony of accomplice Joe Lawrence, in exchange for which Lawrence was sentenced to 68 days in jail on an unrelated charge, and for which an accountability armed robbery charge was dropped. Further, defendant points out that Lawrence admitted that he felt malice toward him.

■■ Courts of review have long been aware of the inherent weaknesses of accomplice testimony. Such testimony is "fraught with serious weaknesses such as the promise of leniency or immunity and malice toward the accused." (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291, 292.) Accomplice testimony is therefore subject to careful scrutiny, and if uncorroborated, is sufficient to sustain a conviction only if it carries an "absolute conviction of the truth." (*Wilson*, 66 Ill. 2d 346, 349-50, 362 N.E.2d 291, 292; *People v. Savory* (1978), 62 Ill. App. 3d 750, 752, 379 N.E.2d 372, 374.) However, whether accomplice testimony is a satisfactory basis for conviction goes to the weight of the evidence, and is therefore a question for the finder of fact. (*Wilson*, 66 Ill. 2d 346, 349, 362 N.E.2d 291, 292; *People v. Hansen* (1963), 28 Ill. 2d 322, 332, 192 N.E.2d 359, 364.) Because of the infirmities of such evidence, material corroboration or direct contradiction of the testimony is entitled to considerable weight. *People v. Hermens* (1955), 5 Ill. 2d 277, 286, 125 N.E.2d 500, 505.

Whatever the vagaries or infirmities of Joe Lawrence's testimony in the instant case, we believe it was supported by sufficient corroborating evidence to support the jury's finding that defendant was guilty. The testimony of both Louis Batson and Helen Burns placed defendant in the company of Joe Lawrence on the night of the robbery, as Lawrence testified. Detective John Lange, maintaining surveillance outside the liquor store, observed that the robbery was committed by a white man

who was accompanied in the car by a black man. The car was immediately identified as belonging to defendant.

Louis Batson corroborated Lawrence's claim that defendant had a gun on the day of the offense. Helen Burns testified that she had seen a holster in defendant's car, and she identified the one in evidence as the one she had seen. Furthermore, the license plates on the getaway car were registered to defendant. What is more, similarity between the defendant's hair and the hair found on the comb recovered from the 1968 white Dodge was established. While this is not conclusive evidence, it does lend further credence to Lawrence's testimony.

Defense testimony did little to contradict the State's evidence. Howard Reynolds denied that Lawrence was in defendant's presence during the day of the offense, unlike Lawrence's testimony. Paul Reynolds testified that he was with defendant on the evening of the offense. However, he admitted on cross-examination that he was with defendant on a Saturday, while the robbery took place on a Sunday.

■■ Convictions based on accomplice testimony will be reversed only if such testimony is impeached by prior inconsistent statements, contradicted by undisputed facts or other credible evidence, or is improbable or incredible. (*People v. Hermens* (1955), 5 Ill. 2d 277, 286, 125 N.E.2d 500, 505; *People v. Price* (1974), 21 Ill. App. 3d 665, 675, 316 N.E.2d 289, 294-95.) We find no merit to this argument by defendant.

Defendant's next allegation is that he was prejudiced when forced to appear before the jury in handcuffs. On the second day of trial, defendant was brought into the courtroom in handcuffs, which were removed in the presence of the jury. Defense counsel made an *in camera* objection, which was overruled. At lunch recess the same day, defendant was rehandcuffed, again in the jury's presence. Counsel's objection was again overruled. At the post-trial hearing counsel reiterated his objection and acknowledged that the court had instructed the deputy not to handcuff the defendant in the courtroom. Counsel also objected at this time to the lack of an instruction to the jury regarding defendant's appearance in handcuffs. This was restated on appeal.

■■ We reiterate the established principle that a criminal defendant has a right to confront the jury with "the physical indicia of innocence." (*People v. Harlan* (1979), 75 Ill. App. 3d 168, 170, 393 N.E.2d 1203, 1205; *People v. Boose* (1977), 66 Ill. 2d 261, 265-66, 362 N.E.2d 303, 305.) This right must be protected to the fullest extent consistent with necessary security requirements. However, while it is presumed prejudicial to restrain a defendant continuously during a court proceeding (*People v. Boose* (1977), 66 Ill. 2d 261, 265-66, 362 N.E.2d 303, 305; *In re Staley* (1977), 67 Ill. 2d 33, 364 N.E.2d 72, 73-74), the brief, unaggravated viewing of a defendant in handcuffs is generally not grounds for a

72

mistrial. (*People v. Hyche* (1978), 63 Ill. App. 3d 575, 583, 380 N.E.2d 373, 379; *People v. Foster* (1980), 80 Ill. App. 3d 990, 995, 400 N.E.2d 462, 467.) Therefore, while we urge greater care than was evidenced here in protecting defendant's right to a fair trial, we do not find that the brief viewing of defendant in handcuffs was so prejudicial as to require reversal of his conviction. Furthermore, since defendant did not propose a jury instruction on the matter, the court was under no obligation to give such an instruction. *People v. Conway* (1971), 3 Ill. App. 3d 69, 73, 278 N.E.2d 852, 855.

■■ Defendant next complains that he was prejudiced by a discussion among the jurors, during their deliberations, of his failure to testify. Three jurors testified at the hearing on the motion for new trial. The testimony revealed that—during deliberations—a juror said, "If he was not guilty he would want to testify." Another juror responded by pointing out that this opinion was contrary to the court's written instruction concerning the defendant's failure to testify, and this juror then read the instruction. Another juror noted that they had been asked on *voir dire* whether they would consider the defendant's failure to testify as an indication of guilt. The first juror responded that this question had been asked of others on his venire panel, but had not been asked of him.

Our supreme court has recently addressed the issue of impeachment of a jury verdict in *People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656, and *People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359. The court outlined the prevailing majority opinion in *Holmes*:

> "An examination of the authorities shows that the situations in which the testimony or affidavit of a juror is offered in an attempt to impeach a jury verdict fall into two broad categories. In the first category are those instances in which it is attempted to prove by a juror's testimony or affidavit the motive, method or process by which the jury reached its verdict. These, almost without exception, have been held inadmissible. [Citation.] The second category involves those situations in which the testimony or affidavit of a juror is offered as proof of conditions or events brought to the attention of the jury without any attempt to show its effect on the jurors' deliberations or mental processes. In most jurisdictions such proof is admissible." *Holmes*, 69 Ill. 2d 507, 511-12, 372 N.E.2d 656, 658.

The court's holding in *Holmes* was explained in *Preston*:

> "The holding in *Holmes* was that the testimony or affidavit of a juror could be admitted for the purpose of showing that the jury had made a private investigation into evidentiary matters bearing on an issue in the case, thus availing itself of information which the defendant had had no opportunity to refute. *Holmes* expressly

preserved, however, the almost universally followed rule that the use of affidavits or testimony to show 'the motive, method or process by which the jury reached its verdict' was not permitted." (*Preston*, 76 Ill. 2d 274, 288, 391 N.E.2d 359, 365-66.) It is immediately apparent that the testimony of the jurors in the instant case concerned the "motive, method, or process" of the jury's deliberation, and did not involve "a private investigation into evidentiary matters." Thus, it is not a proper ground for impeachment of the verdict. Furthermore, the testimony made it apparent that the jurors were fully aware of the instruction not to consider defendant's failure to testify as evidence of his guilt. Accordingly, defendant has established no grounds for reversal of his conviction on this basis.

Defendant also alleges a conflict of interest on the part of his attorney, both at trial and at the post-trial hearing. There is no basis for the claim of conflict at trial. At the preliminary hearing Joe Lawrence's statement was introduced into evidence through the testimony of Detective Lange, who took the statement. Defense counsel objected because counsel was also representing Lawrence at that time. Shortly thereafter, however, Lawrence's representation was transferred to another assistant public defender, who negotiated Lawrence's guilty plea to the unrelated charge of criminal damage to a motor vehicle.

■■■ At trial, defendant did not call the court's attention to any conflict of interest, nor was it plainly apparent of record. Under such circumstances, the issue is held waived. (*People v. Precup* (1978), 73 Ill. 2d 7, 18-19, 382 N.E.2d 227, 232.) Moreover, the fact that Lawrence was represented by another member of the public defender's office is immaterial, since a public defender's office is not to be considered *per se* as a law firm or an "entity" in considering a conflict of interest claim. (*People v. Nelson* (1980), 82 Ill. 2d 67, 411 N.E.2d 261; *People v. Miller* (1980), 79 Ill. 2d 454, 461, 404 N.E.2d 199, 202-03; *People v. Robinson* (1979), 79 Ill. 2d 147, 402 N.E.2d 157; *People v. Spicer* (1979), 79 Ill. 2d 173, 402 N.E.2d 169.) In addition, defense counsel zealously and effectively cross-examined Lawrence and vigorously represented defendant at trial. Therefore, even though the interests of defendant and Lawrence diverged, it is clear that defendant's attorney labored under no "'actual conflict of interest manifested at trial,'" as is required. *People v. Vriner* (1978), 74 Ill. 2d 329, 341, 385 N.E.2d 671, 675-76.

Defendant's second allegation of counsel's conflict of interest is with regard to the post-trial hearing. Following trial and before the hearing, the defendant sent letters to the trial judge complaining about tactics exercised by counsel at trial. Counsel attached these letters to a motion for a new trial, and based an allegation of ineffective assistance on them. At the post-trial hearing, the trial judge explained to defendant that counsel was

unable to argue his own incompetence and repeatedly offered defendant different counsel or an opportunity to represent himself. Defendant rejected both alternatives, opting instead to retain trial counsel.

Two issues are presented: (1) whether defendant was denied the assistance of counsel in preparing and arguing his contention that trial counsel was ineffective; and (2) whether, because of the allegations of incompetence made against him by defendant, trial counsel labored under a conflict of interest in presenting the other grounds contained in the motion for a new trial.

After a discussion with both the state's attorney and defense counsel, the trial judge concluded that defendant should be offered new counsel to argue not only defendant's own *pro se* letters contending ineffective assistance, but also the other allegations raised by counsel in the motion for new trial. When the judge offered defendant newly appointed counsel, however, defendant specifically rejected the offer. In response to this rejection, the judge offered defendant the opportunity to represent himself on the ineffective assistance claim, and defendant likewise rejected this opportunity. Trial counsel then presented and argued the other grounds for new trial, while defendant's *pro se* allegation of ineffective assistance was not argued.

■■ Analogy is drawn by defendant between this situation and that in *People v. Adams* (1979), 74 Ill. App. 3d 727, 393 N.E.2d 658. In *Adams*, as here, defendant filed a *pro se* motion, in effect alleging ineffective assistance of counsel. Counsel both here and in *Adams* recognized their inability to argue the contention. As in *Adams*, the representation that counsel afforded the defendant on the claim consisted of transcribing what defendant had told him, the State conceding counsel's inability to argue his own inadequacy. There is one critical difference, however, between the two cases. In *Adams* the court "asked defendant if he wanted to have a different lawyer to proceed on the motion and defendant said he did," yet the court never ruled on the defendant's motion for a new attorney. (74 Ill. App. 3d 727, 730, 393 N.E.2d 658, 660.) Defendant met the requirements for appointment of counsel in that case—he was indigent and requested counsel. In the instant case, defendant repeatedly rejected the offer of different counsel. The trial judge noted as much when he commented, "* * * unless Mr. Bennett requests it I am not in a position to relieve Mr. Stasiulis of representation and appoint a complete new Counsel * * *." Furthermore, defendant was given an opportunity to make arguments on his own behalf regarding his claim of ineffective assistance of counsel, but declined to do so. We can hardly predicate reversal on the lack of different counsel which defendant repeatedly refused to accept. Therefore, the issue was waived. Additionally, the record shows that the complaints made by defendant in

his letters to the judge pertained to counsel's trial tactics, a matter which cannot support a charge of incompetence of counsel. *People v. Greenlee* (1976), 44 Ill. App. 3d 536, 358 N.E.2d 649.

■■ Defendant's final contention is that his sentence was excessive. Following trial, defendant filed an objection to the presentence report, urging the excision of arrest and police reports. Defendant's objection was sustained, but the proposed revisions were never made. Defendant also complains that the report made no reference to available community resources, pursuant to section 5—3—2(a)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—3—2(a)(2)). We find that any error with regard to the presentence report is harmless. It is presumed that the court disregarded improper information. (*People v. Frenchwood* (1963), 28 Ill. 2d 139, 142, 190 N.E.2d 767, 769.) Furthermore, defendant had an extensive prior record of convictions, including convictions for assault and battery, reckless homicide, second degree burglary, three thefts, illegal use of a credit card, and a parole violation.

■■ Armed robbery is a Class X felony, for which the sentence is a fixed term between 6 and 30 years. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—1(b) and 1005—8—1(a)(3).) Defendant's sentence of 10 years was not an abuse of discretion (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883), nor has the presumption that it is correct been rebutted (*People v. Choate* (1979), 71 Ill. App. 3d 267, 275-76, 389 N.E.2d 670, 676).

Further, we do not believe defendant's sentence was too harsh in light of the co-defendant's 68-day jail sentence on another charge. Where the co-defendant's sentence was attributable to an agreement which he made pursuant to his plea of guilty, his sentence does not provide a valid basis of comparison. (See *Corbitt v. New Jersey* (1978), 439 U.S. 212, 218-19, 58 L. Ed. 2d 466, 474, 99 S. Ct. 492, 297.) Joe Lawrence testified that he was unaware of the armed robbery until after it took place, whereupon he aided defendant in evading police. This lesser role in the commission of the offense is also a factor in explaining the different sentence he received.

On the basis of the foregoing analysis, we hereby affirm defendant's conviction and sentence.

Affirmed.

JONES, P. J., and KARNS, J., concur.