THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PETER REDISI, Defendant-Appellant.

Second District   No. 2—87—0304

Opinion filed August 5, 1988.

1004

Julius Lucius Echeles, of Chicago (Frederick F. Cohn, of counsel), for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers, Robert J. Biderman, and J. A. C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Peter Redisi, was charged with home invasion, residential burglary, and aggravated battery in an information filed in the circuit court of Lake County. (Ill. Rev. Stat. 1987, ch. 38, pars. 12—11, 19—3, 12—4(a).) A jury found him guilty of all three of the offenses charged. The circuit court vacated judgment on residential burglary and aggravated battery and sentenced defendant to a 45-year extended term of imprisonment for the home invasion.

Defendant raises five issues on appeal. Defendant contends that (1) the State failed to prove beyond a reasonable doubt that he was one of the people who committed the offenses; (2) assuming *arguendo* the evidence was sufficient to prove that he was one of the persons who committed the offenses, the State failed to prove beyond a reasonable doubt that defendant, when he entered the house, knew or had reason to know that one or more persons were present, and so failed to prove that a home invasion was committed (Ill. Rev. Stat. 1987, ch. 38, par. 12—11); (3) he was denied due process of law because the home invasion count of the information charged that he "entered the dwelling of William Ditton *** *having reason to know* William Ditton to be present within that dwelling" (emphasis added) but the jury instructions permitted conviction of home invasion if the State proved "[t]hat when [defendant] entered the dwelling place he *knew or had reason to know* that one or more persons was present" (emphasis added); (4) the home invasion statute violates due process of law because the "had reason to know" language is vague and standardless; and (5) he was improperly sentenced to an extended term of imprisonment because none of the statutory aggravating factors permitting the imposition of an extended term was present (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b).) We affirm the conviction for home invasion, vacate the sentence, and remand for resentencing.

The evidence tended to establish that William Ditton arrived home at 6:15 p.m. on Saturday, April 19, 1986. Ditton's wife was away on a trip to Duke University, and his two children were at school, so he was alone. Several lights were on a timer, so from the

outside of the house Ditton could see lights on in the hallway, the center entry hallway, the living room on the first floor, and the master bedroom on the second floor. The house has three outside doors—a patio door in the kitchen, a back door in the hallway, and a front door in the hallway. All three were locked.

Ditton left his car in the driveway, went into the kitchen, and then went downstairs to the rec room to watch "Wheel of Fortune" on television. After "Wheel of Fortune" ended, Ditton went upstairs to the kitchen, made himself something to eat, and went back downstairs. He did things other than watch television for awhile and, when he finished eating, went upstairs to put his dishes in the dishwasher. Ditton went back downstairs and, at 8 p.m., began to watch "Golden Girls" on television.

While watching "Golden Girls," Ditton heard a noise that he attributed to the icemaker until he heard something running around upstairs. He slowly and quietly went up to investigate. When he was near an open staircase on the first floor, he could hear noise on the second floor. As he got to the end of the staircase, he saw towels and pillow cases from the linen closet on the floor at the bottom of the stairs. Earlier that night, when he had arrived home, he had walked through that area, and the towels and pillow cases had not been there.

Ditton came around the end of the staircase and saw a man he later identified as defendant. Defendant was wearing black gloves and dark clothes. He had dark hair, which Ditton later noticed was heavy and very oily. He had a dark complexion, looked like he needed a shave, and looked to be about Ditton's age. Ditton later estimated his height to be about 5 feet 6 inches or 5 feet 8 inches. Ditton did not notice any scars.

There is no wall between the living room and the hallway, and defendant was kneeling in the area between the two, rolling figurines into a towel. When he finished this, he looked up and saw Ditton. Ditton grabbed the still kneeling defendant, getting an arm around his neck. Ditton pulled defendant backwards into the living room, and noticed that defendant was not fighting back. Ditton was squeezing defendant's throat. Defendant (who has severe asthma) was breathing heavily and started gasping for air as Ditton was pulling him back. Ditton got to an end table and picked up a heavy ashtray. Defendant grabbed Ditton's arm, started struggling, and called for help. Someone other than defendant hit Ditton over the head.

Ditton, who sees very well with his glasses but without them cannot clearly see things close to him, lost his glasses at this point. Bro-

ken parts of them were later found in the area where the struggle occurred.

After he was hit, Ditton pushed defendant into the other person and ran downstairs. He called the police on the telephone. The police came, talked to Ditton, and searched for evidence. A briefcase not belonging to the Dittons was found in the house. It contained a Radio Shack police calling guide and miscellaneous jewelry. A fingerprint found on the briefcase was not defendant's.

Ditton went to Highland Park Hospital, where he received six stitches for a laceration to his head. That night, friends took him from the hospital to the Deerfield police station. At the request of the officers there, Ditton looked at a group of photographs. He did not have his glasses and could not see the photographs very well. Ditton could not pick anything out, even though one of the photographs he was shown was of defendant. As he could not see, Ditton told the police there was no sense in his looking at the photographs. He went over his description with the police. The police took Ditton home, where they walked through the house with him to make sure it was secure.

On April 24, 1986, Ditton went back to the Deerfield police station. They showed him another group of photographs. Ditton identified a photograph of defendant as a photograph of the man he had seen kneeling and with whom he had struggled. On October 1, 1986, Ditton returned to the Deerfield police station. He viewed a corporeal line up and identified defendant as that man. On February 17, 1987, during his testimony at defendant's trial, Ditton identified defendant as that man.

Defendant presented an alibi defense. His evidence tended to establish that he was planning to go to Florida to work for his son's ex-wife's mother, Lena Bellon. He was to leave on April 20, 1986. At about 10 a.m. on April 19, 1986, he picked up his grandchildren at the home of his former daughter-in-law. She asked him to have the children back before 5 p.m., so he returned them to their home at about 4:30 p.m.

Defendant, his sister Frances Redisi, their ailing 75-year-old mother, and Frances' son lived in a house at 617 North Racine Avenue in Chicago. On April 19, 1986, between 6 p.m. and 6:30 p.m., defendant drove Frances to play bingo. On the way, they picked up Frances' friend, Christine Mary Donati, at Racine and Grand. Santa Marie Delgado Church, where bingo was to be played, was about four blocks away. They arrived there at sometime between 6:15 p.m. and 6:30 p.m.

Jacqueline Menconi and her sister Mary Catalano are first cousins

to defendant and Frances. They are partners in business as real estate brokers. On April 19, 1986, they arrived at defendant's house at about 7 p.m. Defendant and his mother were there when they arrived. Defendant left and picked up Frances and Christine at sometime around 9:30 p.m. and 9:45 p.m. They dropped Christine off and went home, arriving at around 10 p.m. Jacqueline Menconi and Mary Catalano left at sometime after 11 p.m., at which time defendant was still present.

Defendant left for Florida the next morning, Sunday, April 20, 1986. He had called Lena Bellon the prior Friday or Saturday for directions. Bellon testified that he called again on Sunday afternoon from Atlanta, Georgia. Defendant called her again on Monday morning when he arrived in Port Ritchie, Florida. They met at about 7 a.m. or 7:30 a.m. at a Convenient Store so Bellon could lead him back to the trailer where her daughter was living. According to Bellon, it is a 22-hour drive between Port Ritchie and Chicago, and it is a 14-hour drive between Atlanta and Chicago.

■■ Defendant first contends the evidence was insufficient to prove beyond a reasonable doubt that he was the man with whom Ditton struggled the night of April 19, 1986. The evidence on this issue set the identification of defendant by Ditton against the alibi testimony presented by defendant. The applicable rule is that a trier of fact is not obliged to disregard positive identification testimony in order to believe the testimony of a defendant's alibi witnesses. (*People v. Berland* (1978), 74 Ill. 2d 286, 307, 385 N.E.2d 649, 658, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63; *People v. Green* (1980), 88 Ill. App. 3d 929, 932, 410 N.E.2d 1003, 1006.) Accordingly, where a positive identification is made, a guilty verdict may be sustained even though there may be otherwise uncontradicted alibi evidence. *People v. Speck* (1968), 41 Ill. 2d 177, 194, 242 N.E.2d 208, 218, *rev'd on other grounds* (1971), 403 U.S. 946, 29 L. Ed. 2d 855, 91 S. Ct. 2279.

Defendant begins his argument on this issue with an excellent discussion of the well-known weaknesses of eyewitness testimony, concluding:

> "[A] finding that the eye witness is both 'credible' and 'positive' is not determinative of whether the identification is sufficient to support a conviction beyond all reasonable doubt. The eye witness may be both honest and positive and yet mistaken."

Defendant here has treated credibility as merely a matter of honesty. However:

> "Credibility is dependent upon the willingness of the witness to tell the truth and upon his ability to do so. His ability to tell the truth of an event as to which he purports to possess personal knowledge is the product, in turn, of the accuracy of his perception, his powers of recordation and recollection, and his capacity to communicate." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607, at 316 (4th ed. 1984).)

Thus, contrary to the implication of defendant's argument, an honest witness may nonetheless lack credibility. Moreover, to the extent defendant is arguing contrary to the rule that a trier of fact may believe a positive identification over an uncontradicted alibi, he is arguing for a change in the law which would have to come from our supreme court rather than from this court.

■ Ditton's identification of defendant was positive and consistent. He identified defendant first at a photographic lineup five days after the offense, next at a corporeal lineup approximately 5½ months after the offense, and finally at trial approximately 10 months after the offense. He never wavered from this identification. Thus, the evidence was sufficient for the jury to find defendant guilty of the offense even though defendant presented an alibi defense.

■ Defendant notes many facts that he contends indicate the identifications were unreliable. The admissibility of the out-of-court and in-court identifications is not at issue, so the factors defendant notes went to the credibility of the identifications and were matters for the jury to weigh. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.) We will, however, briefly discuss several of the factors most prominently noted by defendant to show that they had little, if any, effect upon the credibility of Ditton's identification of defendant.

Defendant notes that Ditton failed to identify defendant's photograph the first time he had an opportunity to do so, the night of April 19, 1986. However, this is understandable as Ditton did not have his glasses then and so was unable to see well.

Defendant notes that Ditton failed to notice a scar on defendant's face. A witness in court was unable to see this scar from the witness stand, having to move closer to defendant in order to see it. Moreover, during his closing argument, defense counsel said:

> "One of the things about Peter Redisi, you can see it from your vantage point—you really can't see it, but you can se [*sic*] it in this picture, and there is a scar on his chin."

It is apparent that the scar was not so prominent that Ditton's failure to notice it destroyed the credibility of his identification of defendant.

Defendant notes that the corporeal identification did not take place until approximately six months after the offense. However, Ditton identified defendant from a photographic lineup only five days after the offense, so this is of little significance.

Defendant says:

> "Ditton observed the assailant during the fight eyeball to eyeball. Such closeness does not render a good opportunity to observe."

In fact, Ditton observed the man for a time from a short distance away, up until the man turned and noticed him. Thereafter, he observed the man from close quarters during their struggle. Ditton was wearing his glasses throughout these observations and sees quite well with them. The combination of vantage points from which Ditton viewed the man gave Ditton a far better opportunity to observe him than defendant acknowledges.

■ We finally note that defendant argues at some length that the photographic and corporeal lineups were both suggestive. However, since the admissibility of the identifications is not at issue, these were factors going to the credibility of the identifications and were for the jury to weigh. See *Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.

On the facts of this case, the jury could properly choose to believe the positive identification of the defendant by Ditton rather than the alibi evidence. We therefore will not reverse defendant's conviction on the ground that the evidence was insufficient to prove beyond a reasonable doubt that defendant was the man with whom Ditton struggled on April 19, 1986.

■ Under his second issue, defendant contends the evidence was insufficient to prove beyond a reasonable doubt that he knew or had reason to know that one or more persons was present when he entered Ditton's dwelling, and therefore was insufficient to prove him guilty of home invasion. (Ill. Rev. Stat. 1987, ch. 38, par. 12—11.) Defendant makes two arguments in this regard: (1) that the evidence was insufficient to prove that anyone was physically present at the time defendant entered the dwelling and (2) that the evidence was insufficient to prove that defendant knew or had reason to know anybody was present when he entered the dwelling. We disagree.

Regarding his first argument under this issue, defendant correctly interprets the statute to require proof that somebody was physically present at the time of the entry. As our supreme court has held:

> "[T]he statute requires the physical presence of one or more persons in the dwelling to constitute a home invasion." (*People*

*v. Pettit* (1984), 101 Ill. 2d 309, 313, 461 N.E.2d 991, 993.)
In the case at bar, Ditton testified that all of the outside doors were locked. After arriving home on April 19, 1986, he had walked through the hallway area, in which were both the front door and the door to the backyard. The door which was damaged by the entry of the burglars was the door to the backyard. The evidence would permit a trier of fact to conclude that Ditton would have observed the damage to the backyard door if the burglars had entered before he walked through the hallway area. Since he did not notice any damage to that door, it could be concluded that the burglars damaged the door entering the house while Ditton was in the downstairs rec room.

Regarding the sufficiency of the evidence to prove that defendant knew or should have known of the presence of one or more persons when he entered the dwelling, it is significant that the evidence was sufficient to permit the conclusion that Ditton entered the house before defendant did. That means it can be concluded that Ditton's car was parked outside on the driveway when defendant entered the house. In addition, there were several lights on inside the house that were visible from the outside. That the television was on in the basement rec room and Ditton moved several times between the kitchen, on the first floor, and the rec room, downstairs in the basement, made it more likely that a person outside the house would have seen or heard signs of the presence of a person in the house. The jury could properly conclude from all of these facts that defendant had reason to know somebody was present when he entered Ditton's dwelling. As the evidence was not so unsatisfactory on these points to raise a reasonable doubt of defendant's guilt, we will not overturn the jury's verdict. *People v. Adams* (1985), 109 Ill. 2d 102, 115, 485 N.E.2d 339, 342, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476.

■ Under his third issue, defendant contends that he was denied due process of law because the home invasion count of the information charged that he "entered the dwelling of William Ditton *** *having reason to know* William Ditton to be present within that dwelling" while the jury instructions permitted conviction of home invasion if the State proved "[t]hat when [defendant] entered the dwelling place he *knew or had reason to know* that one or more persons was present." (Emphasis added.) Defendant never objected to the home invasion instructions on this ground; never tendered proper instructions; and never raised the issue in his post-trial motion. This issue has therefore been waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 185-90, 522 N.E.2d 1124, 1129-31; *People v. Foster* (1982), 103 Ill.

App. 3d 372, 376-78, 431 N.E.2d 430, 434-35.

Supreme Court Rule 451(c) provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." (107 Ill. 2d R. 451(c).) This exception to the waiver rule "is limited to the correction of 'grave errors,' or is to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed." (*People v. Foster* (1982), 103 Ill. App. 3d 372, 376, 431 N.E.2d 430, 434, citing *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861.) The error asserted was not grave, nor would fundamental fairness require that the jury be properly instructed in the case at bar.

The reason is that defendant could not possibly have been prejudiced by the instruction of which he complains. The instructions given permitted conviction of home invasion if the State proved that when defendant entered the house he "knew or had reason to know" that someone was present in the house. According to defendant, the instructions should have permitted conviction of home invasion only if the State proved that when defendant entered the house he "had reason to know" someone was present in the house. Defendant could only be prejudiced if it was proven that he knew, but did not have reason to know, that someone was present in the house. This is clearly impossible since knowledge of the presence of a person in the house would, by itself, give defendant reason to know someone was present in the house. Accordingly, defendant could not have been prejudiced by the error asserted, so it will not be considered pursuant to Supreme Court Rule 451(c). 107 Ill. 2d R. 451(c).

■ Under his fourth issue, defendant contends that the "had reason to know" language of the home invasion statute (Ill. Rev. Stat. 1987, ch. 38, par. 12—11) is so vague and standardless that it violates due process of law. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2.) The issue of the constitutionality of the home invasion statute was not raised in the trial court. It has therefore been waived and will not be decided. *People v. Myers* (1981), 85 Ill. 2d 281, 290-91, 426 N.E.2d 535, 539; *People v. Williams* (1977), 66 Ill. 2d 179, 188-89, 361 N.E.2d 1110, 1115.

Under his fifth issue, defendant argues that the trial court improperly sentenced him to an extended term of imprisonment because none of the required aggravating factors was present. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b).) The State argues that defendant waived this issue by failing to raise it at the sentencing hearing and by failing to raise it in his post-trial motion. Alternatively, the State argues that the trial court could properly impose the extended term

because the home invasion "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

■ We address first the State's waiver arguments. The contention that defendant waived the issue by failing to raise it in his motion for a new trial is meritless. The alleged error occurred during sentencing, which took place after the motion for a new trial had been filed, heard, and denied. It has been held:

"[T]hat the defendant [is] under no duty to file a post-sentencing motion asking for a new sentencing hearing to preserve errors which he alleges occurred at that point." (*People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1083, 456 N.E.2d 250, 261.)

Defendant's failure to raise the alleged sentencing error in his posttrial motion did not waive the issue for review.

■ The State's other waiver argument is more substantial. Defendant did fail to object to the imposition of an extended-term sentence on the ground that it was not authorized by the statute because none of the necessary aggravating factors was present. However, the error asserted "clearly affected the defendant's fundamental right to liberty [citation] and impinged on [his] right not to be sentenced based on improper factors [citation]." (*People v. Martin* (1988), 119 Ill. 2d 453, 458, 519 N.E.2d 884, 886.) Because the issue raised by defendant affects substantial rights, we will review it as plain error. 107 Ill. 2d R. 615(a); *People v. Kaebel* (1987), 151 Ill. App. 3d 668, 670, 503 N.E.2d 373, 375 (consideration by sentencing court of improper aggravating factor reviewed as plain error).

The State does not contend, and the record does not establish, that: (1) defendant had previously been convicted of a Class X or greater class felony within 10 years, excluding time spent in custody, of the home invasion conviction at bar (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(1)); (2) Ditton was under 12 years of age, was 60 years of age or older, or was physically handicapped at the time of the offenses (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(3)); or (3) the offense was one described in section 5—5—3.2(b)(4) of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(4)). The State does contend that the trial court could properly impose an extended term because "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

■ Defendant was found guilty of residential burglary (a Class 1 felony), aggravated battery (a Class 3 felony), and home invasion (a Class X felony). (Ill. Rev. Stat. 1985, ch. 38, pars. 19—3, 12—4, 12—

11.) He was sentenced to a 45-year extended term of imprisonment for home invasion. The Illinois Supreme Court has held:

> "[W]hen a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class and *only if that offense was accompanied by brutal or heinous behavior.* (*People v. Evans* (1981), 87 Ill. 2d 77.)" (Emphasis added.) (*People v. Jordan* (1984), 103 Ill. 2d 192, 206, 469 N.E.2d 569, 575.)

(Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a).) Thus, the extended term imposed for home invasion was proper only if the home invasion was accompanied by brutal or heinous behavior.

The home invasion of which defendant was convicted is defined as follows:

> "A person who is not a peace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and
>
>    \* \* \*
>
> (2) Intentionally causes any injury to any person or persons within such dwelling place." (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2).)

The evidence did not establish that the home invasion "was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

Until defendant was confronted by Ditton, it appears that he and his accomplice were attempting to commit a nonviolent residential burglary of, and theft from, the house. When Ditton grabbed defendant, he did not fight back even though Ditton was squeezing his throat and he was gasping for air. Only after Ditton lifted up the heavy ashtray did defendant begin to struggle and call for help. When defendant's accomplice arrived, he hit Ditton over the head, causing a laceration requiring six stitches. However, after Ditton released defendant and ran into the basement, it appears that neither defendant nor his accomplice attempted to do Ditton any further harm but, rather, fled.

We by no means are critical of Ditton's actions that night; he was merely doing his best to protect himself and his home from criminals who had no right to be there. We also by no means condone defendant's actions that night; the evidence was sufficient to permit the jury to find him guilty of home invasion, and he will have to serve a Class X sentence for that offense. However, this home invasion was not by

any reasonable interpretation of the phrase "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

The State makes several points about facts the trial court considered and the trial court's discretion in sentencing that are not relevant to the question of whether an extended term could properly be imposed. We will not address these points. In its argument, the State, while conceding that Ditton was not severely physically injured, contends that the emotional trauma to him was sufficient to establish the wanton cruelty aggravating factor. We will make four points with respect to this argument.

First, the State's focus is wrong. While it would be an unfortunate result of the crime and, in a proper case, could be considered in aggravation of a sentence (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(1)), proof of emotional trauma to Ditton would not affect our opinion, based on the manner in which the offense was committed, that the home invasion at bar was not "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

Second, the State has cited no cases holding that emotional trauma to the victim is alone enough to establish that "the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

Third, the State has misstated the holding of a case. The State says:

> "As the court held in *People v. Hamilton,* 81 Ill. App. 3d 297, 37 Ill. Dec. 637, 401 N.E.2d 318, 323 (4th Dist. 1980), even though the victims were not severely injured physically, crimes often result in severe emotional trauma to the victims."

The defendant in *Hamilton* was convicted of rape, deviate sexual assault, attempt (rape), burglary, and aggravated battery. (*People v. Hamilton* (1980), 81 Ill. App. 3d 297, 298-99, 401 N.E.2d 318, 319.) The sentence of the opinion to which the State refers, which is not actually a holding, is part of a discussion of whether the sentences imposed were excessive. The court actually said:

> "Although the victims of these offenses were not severely physically injured, *this type of crime* often results in severe emotional trauma to the victim." (Emphasis added.) (*People v. Hamilton* (1980), 81 Ill. App. 3d 297, 304, 401 N.E.2d 318, 323.)

Thus, the court was referring to a specific type of crime (obviously

sex offenses), and not to crimes generally, as the State has asserted.

Fourth, the State's brief is misleading regarding the contents of the record. The State argues:

"[Ditton] stated in the presentence investigation report that he and his family have experienced much anxiety from this ordeal. They are increasingly careful when entering and leaving the residence. Mr. Ditton fears that the defendant or others will re-enter his home. He states he is angry that defendant violated his right to peace and security within his home.

Additionally, the court took into consideration ***."

A careful reading of the record reveals that, in the presentence investigation report filed March 13, 1987, the probation officer wrote:

"This officer has requested a victim impact statement from Mr. William Ditton. As of this date [March 11, 1987], no statement has been received. This officer has requested assistance from George Strickland, of the State's Attorneys office and upon receipt of documents, an addendum will be filed with the Victim Impact Analysis."

At the time of the sentencing hearing on March 18, 1987, there was still no victim impact statement available. In addition, Ditton did not testify. The prosecutor noted these facts in his sentencing argument:

"In the presentence investigation here it states that Mr. Ditton was not contacted. I have talked to Mr. Ditton, as well as Mr. Weitzel [the probation officer]. He is not here, Judge, because he is apprehensive. He cooperated in the investigation.

MR. CAPLAN [defense counsel]: Judge, again, I'm objecting to that unless—

THE COURT: Sustained. He doesn't have to be here.

MR. STRICKLAND [assistant State's Attorney]: I'm not trying to give a victim impact report, Judge."

Sentencing was completed, and a written judgment and mittimus were filed, on March 18, 1987.

On March 19, 1987, a "Victim Impact Analysis" was filed. It consisted of a summary by the probation officer of a letter from Ditton. This is the document from which the State derived the information which it asserted Ditton "stated in the presentence investigation report." This information was never properly presented to the court to be considered in sentencing defendant simply because it was not filed until after sentence had already been imposed. The State's brief is highly misleading because it implies that Ditton's statements contained in the "Victim Impact Analysis" filed March 19, 1987, were before the court and were considered when defendant was sentenced on

March 18, 1987. The information contained in the "Victim Impact Analysis" was not before the sentencing court, was not considered by that court in imposing sentence, and has not been considered on appeal in reviewing the sentencing of defendant.

The judgment of the circuit court of Lake County finding defendant guilty of home invasion is affirmed; the sentence is vacated; and the cause is remanded for resentencing of defendant to a nonextended term of imprisonment.

Affirmed in part; vacated in part and remanded.

UNVERZAGT and WOODWARD, JJ., concur.