THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARRY RODRIGUEZ, Defendant-Appellant.

First District (6th Division)   No. 1—88—1022

Opinion filed September 6, 1991.

Randolph N. Stone, Public Defender, of Chicago (Elizabeth Burke and Jeffrey M. Howard, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Jean T. McGuire, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Harry Rodriguez, was indicted for the capital murder of Raymond Carvis, residential burglary, home invasion and armed violence. Indicted with him were Fernando Gomez, Robert Cardona, Gregory Cardona, Lowell Higgins-Bey and Michael McCastle. The defendant was tried separately and found guilty of murder, residential burglary and home invasion. He was sentenced to natural life without parole for murder, 30 years for home invasion and 15 years for residential burglary.

Two of the codefendants, Fernando Gomez, known as Pee Wee, and Lowell Higgins-Bey, known as Lowdown, testified for the prosecution. Before they testified, the State agreed to drop the capital murder charges against them and recommend four years' imprisonment for residential burglary.

Gomez, who was 19 years old at the time of trial, testified that he was a former member of the Disciples and Spanish Cobras gangs. He quit the gangs five months before he met the defendant. He was on probation for attempted robbery at the time he testified.

On June 22, 1987, he met McCastle, known as Scandalous, Higgins-Bey, the Cardona brothers, known as Little Coco and Big Coco, and the defendant near a church on Wrightwood in Chicago. At that time the defendant talked about making some money and told Gomez to meet him at the Cardona apartment at 1 p.m. the next day.

At 1 p.m. the next day, Gomez went to the Cardona apartment building at Sawyer and Wrightwood. Outside the building he met the Cardona brothers, McCastle and the defendant. The Cardona apartment building was approximately one block away from the home of Raymond Carvis. The defendant announced that they were going to commit a burglary in the neighborhood.

They left the Cardona apartment, and the defendant told Robert Cardona and Higgins-Bey to walk down the alley behind Sawyer. The defendant, McCastle, Gregory Cardona and Gomez walked north on the sidewalk of Sawyer. At one point the defendant told the other men to stop, and the defendant walked on and turned somewhere. Gomez next saw the defendant as he opened the front door of Carvis' house. Upon opening the door, the defendant told Gomez, McCastle and Gregory Cardona to come into the house.

When the front door opened, Gomez saw Carvis standing at the bottom of the stairs inside the house. Gomez, McCastle and Gregory Cardona rushed into the house. McCastle, Gregory Cardona and the defendant grabbed Carvis and carried him upstairs. Once upstairs, they carried Carvis to the left side of the staircase. Carvis fought in an attempt to break free.

While the others were wrestling with Carvis, Gomez walked into one of the upstairs rooms to look for property to steal. He walked out of the first room and saw the others were still wrestling with Carvis. Gomez went into a second room looking for things to take and spent 15 minutes there. When he left the second room he saw Higgins-Bey standing at the top of the stairs.

Gomez himself hit Carvis once or twice. Robert Cardona also hit Carvis a few times. Then everybody started hitting Carvis while McCastle held him by the neck.

The defendant then pulled a "butterfly knife" out of his back pocket and stabbed Carvis in the stomach. Gomez saw the defendant stab Carvis once. Carvis moaned and tried to wrestle free after the stabbing. Higgins-Bey, who had been at the top of the stairs, disappeared. After the stabbing, McCastle threw Carvis onto the floor while Gregory Cardona controlled his legs. Gomez and the two Cardonas then went into the second room, and looked for property to steal.

The defendant told them he needed something with which to tie Carvis up. Robert Cardona brought out a necktie and the defendant tied Carvis' arms behind his back. After tying up Carvis, the defendant and McCastle forced Carvis to his knees. While McCastle held Carvis around the neck, the defendant put his penis near Carvis' face and buttocks. Gomez then left the house through the front door. He did not take anything from the house. He was in the house for about one half-hour and did not hear or see any dogs in the house.

After leaving the house, he walked to the corner of Sawyer and Milwaukee and watched Carvis' house. He saw Gregory Cardona leave the house with things in his hands. Cardona put the things in a car and returned to Carvis' house. Cardona returned to sit in the car, after opening the trunk. Gomez then took the "el" home.

The following day Gomez saw all the other defendants at Diversey and Kedzie. The defendant gave $300 to Gomez, but there was no discussion of what had occurred the day before. He did not see any of the other defendants again until he was arrested two months later on August 29, 1987.

After his arrest, Gomez was questioned by the police, and he subsequently gave a court-reported statement. He admitted that during the police questioning he made up a story about cruising in a car. He told the police that he and the other men drove into an alley near Carvis' house, went to a McDonald's and then went to an apartment on Sawyer. He made up this story to avoid talking about the murder.

He also told the police the defendant knocked on Carvis' door and McCastle and Higgins-Bey grabbed Carvis. He admitted he lied when he said Higgins-Bey was at the front door and that Higgins-Bey kicked Carvis. He explained that he was mad because the police told him that Higgins-Bey had made a statement against him. He did not tell the police that he met with the other men the day before the murder. Nor did he tell the police that he left Carvis' home alone; he said he and the other men all ran out of the house together.

He agreed with the State's Attorney's office to testify; in return for his testimony, the murder charges would be dropped and he would be sentenced to four years' imprisonment. He knew the agreement was "off" if he lied.

Lowell Higgins-Bey testified that he is a former member of the Milwaukee Kings gang, which was associated with the Disciples and Spanish Cobras, and that he was on probation for robbery at the time of trial. He had also spent time at St. Charles Reformatory for robbery as a juvenile.

On the day before the killing, he saw the defendant, McCastle and the two Cardonas. Gomez was about a half block away from the group when Higgins-Bey arrived. At that time McCastle told him that they were going to make some money the next day and to be around. This was the first time anyone mentioned a burglary.

At approximately 1:30 p.m., on June 23, 1987, he met Robert Cardona at Sawyer and Diversey. They walked to the Cardona apartment at Wrightwood and Sawyer, where they saw Gregory Cardona, McCastle and the defendant in front of the apartment building. Higgins-Bey and Robert Cardona then walked to Schubert and Spaulding where they bought marijuana dipped in PCP ("Happy Sticks") for $40. They returned to the Cardona apartment and the defendant, McCastle and the Cardonas smoked the "Happy Sticks."

Outside the Cardona apartment building, the defendant started talking about making some money by committing a burglary. He told the others it would be nearby, and not to worry about anything. They all started walking north from the Cardona apartment building, and the defendant told him and Robert Cardona to walk in the alley. The other men walked up Sawyer. As Higgins-Bey and Robert Cardona waited in the alley, the defendant opened the back door, made a bird call and waved them in. Higgins-Bey and Robert Cardona then went to the back door and climbed on a little table and some crates to get in the door; there was no porch.

Inside the house, the defendant told Higgins-Bey and Robert Cardona to wait in the kitchen. A man Higgins-Bey knew as Rudy came out of the door that led to the basement and told the defendant he was going outside to be the "look-out." Rudy left the house through the front door. Higgins-Bey identified a picture of Rudy Ramirez as the Rudy he saw come up from the basement. He had seen Rudy several times before in the neighborhood. (Rudy was later identified as a person with whom Carvis was having an affair.)

He testified that the defendant then went upstairs. Higgins-Bey and Robert Cardona waited in the kitchen for one or two minutes before proceeding upstairs. He saw the defendant and McCastle at the top of the stairs holding Carvis. McCastle held Carvis' neck and the defendant wrestled with him. Everyone then ran up and hit Carvis. The defendant pulled a knife out of his pocket and stabbed Carvis. The defendant swung the knife towards the front of Carvis' body. The knife was a butterfly knife with a seven- or eight-inch blade, and the handle was the same length as the blade.

After the stabbing, Carvis was falling as he was being held by McCastle. After seeing the defendant stab Carvis, Higgins-Bey left the

house through the back door. He walked down the alley and went to a church at Kedzie and Albany, where he stayed for an hour until the defendant arrived on foot.

He was arrested for the murder on July 15, 1987. He was questioned by the police and by an assistant State's Attorney to whom he gave a court-reported statement. In his statement he said the following: the defendant stabbed the victim; he and Robert Cardona bought three "Happy Sticks" for $30; when they returned to the Cardona apartment, Gomez was there with the other men; and everyone except himself smoked the "Happy Sticks"; he and Robert Cardona waited 5 to 10 minutes in the alley, heard a bird call and went into Carvis' house. He did not tell the State's Attorney about the other person named Rudy who was also in Carvis' house at the time of the incident.

In November 1987 he made an agreement with the State's Attorney's office that if he were to testify and tell the truth, he would be sentenced to four years for residential burglary. If he gave false testimony, he would be tried for murder.

Francisco Martinez, who did odd jobs for Carvis, testified that he had known Carvis for about two years, and that only he, Ronald Griggs, and Carvis had keys to the house. He was employed by Carvis and his roommate, Ronald Griggs, to take care of their dogs and garden. He went to Carvis' house at around 5 p.m. on June 23. He tried to open the front door with his keys, but had difficulty unlocking the door. He knew something was wrong because he did not hear the dogs barking. Eventually he opened the door and entered; he saw the dogs in the kitchen and noticed the microwave oven on the kitchen floor with a garbage bag over it. Carvis' body was tied up and lying in a pool of blood on the closet floor.

Chicago police detective William Kaupert arrived at Carvis' house between 5:30 and 6 p.m. on June 23. Carvis was lying on the second floor in a pool of blood with his arms bound. The blood had begun to coagulate, which indicated to Kaupert that death had occurred a couple hours earlier.

The second-floor bedroom and den appeared to have been ransacked. A cake knife with a broken blade and what appeared to be dried blood near the handle and a steak knife with a serrated edge were found in a drawer in the kitchen.

Ronald Griggs testified that at 12:30 p.m. on June 23 he went to work in Carvis' car. When he returned home at 6:10 p.m. after a call from a neighbor, he found the house ransacked and his stereo and car stolen. The drawer where the police found the knives was not the

drawer in which they were normally stored. When Griggs left the house the day of the killing, the knives were in their proper drawer.

Griggs testified that Carvis had a habit of leaving the doors unlocked when he was home. Carvis had two jobs with a rotating schedule, and he was not scheduled to work on June 23.

Officer John Naujokas, a laboratory technician, testified that he recovered two multicolored bedsheets that were wrapped around Carvis' body, an unusually large knife with a broken blade, and a small steak knife, the knives which were identified by Griggs. The tip of the broken knife was not in the drawer. The broken knife appeared to have been wiped clean. Blood samples were taken from the bathroom wall-switch, the kitchen silverware drawer and Carvis' wallet. None of the blood samples recovered matched the blood of the defendant. Naujokas also dusted the crime area for fingerprints. The defendant's prints were not found. The only identifiable prints were those of Carvis on a drinking glass and the telephone.

Doctor Michael Chambliss performed the autopsy on Carvis' body. Carvis suffered a total of 17 stab wounds and 12 incised wounds. An incised wound is one that is greater in length than in depth. A stab wound is greater in depth than in length. A portion of a knife blade was found in a stab wound in Carvis' neck. Three of the deep stab wounds in Carvis' neck could not have been caused by the knife, the tip of which was recovered from Carvis' neck, because the length of the stab wounds was shorter than the width of the blade. There were five stab wounds in the chest and shoulder areas. There were eight incised wounds to both hands and the right forearm. (The doctor identified these as "defensive wounds," that is, they were incurred while trying to fend off injury.) There was one stab wound to the abdomen. One stab wound in the chest area penetrated the lung. Another stab wound went through the right lobe of the liver. In the opinion of the doctor, none of the wounds could have been caused by a knife with a serrated edge.

Detective Ernest Halvorsen was assigned to investigate this case. During the investigation, he took oral statements from Higgins-Bey, McCastle and the Cardona brothers. An assistant State's Attorney and a court reporter later took statements from Higgins-Bey and the Cardona brothers. After taking the statements, Halvorsen obtained and served an arrest warrant on the defendant.

The defense presented three witnesses: Fabian Pagan, Myrna Ortiz and Detective Raymond Schalk. Pagan testified that he lived in the neighborhood, came home from work about 4 p.m., and noticed that Ronald Griggs' car was parked on the street. His sister-in-law came

to his house to tell him that Carvis was dead. After hearing this, he noticed that Ronald Griggs' car was gone. He did not see who took the car.

Myrna Ortiz was sitting on her sister-in-law's front porch, across the street from Carvis' house, between 12:30 p.m. and 5 p.m. on June 23. She did not see anyone enter or leave the house, except Francisco Martinez, who discovered the body. She saw Carvis in his yard earlier that day with his dogs. She saw Griggs' blue car parked out front but did not see anyone move the car or put things into it.

Detective Ray Schalk talked to Francisco Martinez the day after Carvis died. Martinez told Schalk that he had been instructed by Carvis not to come over until late in the evening on Tuesdays. This was because Mike Vasquez would be there. Martinez did not say that Mike Vasquez had been to Carvis' house the day he died.

By stipulation it was established that Carvis had type O blood, and examination of the broken blade and broken knife disclosed activity indicative of type O blood. The electric wire and the blood taken from the walls had type O blood. There was no semen present on the oral or anal swabs taken from Carvis.

The defendant first contends that the testimony of the two accomplices was incredible and, therefore, insufficient to support his conviction. Initially we recognize that the testimony of an accomplice is to be viewed with suspicion. However, the mere fact that a witness is an accomplice and expects leniency does not of itself raise a reasonable doubt. *People v. Jackson* (1986), 145 Ill. App. 3d 626, 495 N.E.2d 1207.

The defendant relies on *People v. Kiel* (1979), 75 Ill. App. 3d 1030, 394 N.E.2d 883, and *People v. Price* (1974), 21 Ill. App. 3d 665, 316 N.E.2d 289, in which the appellate court reversed convictions based on the testimony of accomplices. In *Kiel*, the accomplice witness was arrested for armed robbery and burglary which occurred two years after the offense for which the defendant was tried. The witness was never prosecuted for those offenses. In rejecting his testimony, the appellate court spoke as follows:

> "[The accomplice was] a witness against whom later occurring offenses were dropped, a witness who failed to make known his story for nearly two years after the incident, and then only after being arrested for robbery and burglary, a witness who, under oath at the time of the preliminary hearing, testified he had no remembrance of the event, a witness whose testimony is inconsistent with other statements and finally, but not the least important, a witness who admitted to the use of

dope and mescaline at the time of the occurrence to the point that he was 'burned out.' " *Kiel*, 75 Ill. App. 3d at 1035-36.

In *Price*, the accomplice witnesses, who were cousins, testified that they participated in the crime because of threats they received from the defendant and that the defendant had initiated and planned the robbery. Other witnesses, however, contradicted them. The appellate court pointed out the improbabilities and inconsistencies in their testimony. The court also had before it an alibi defense to which the defendant, his father and a co-worker of the defendant testified. The court compared the backgrounds of the accomplices and of the defendant. It noted his stable background, including the fact that he was married and had a child, had been honorably discharged from the service and had no criminal record. In addition, he presented the testimony of his employer and foreman who testified to his general reputation for truth and veracity.

■ Factually, *Kiel* and *Price* are markedly different from the case before us. There is no inconsistency between the testimony of Gomez and Higgins-Bey. Higgins-Bey's testimony was not impeached by any previous statements. It was established that both witnesses had identified the defendant in the previous statements. Carvis was found tied with a necktie as Gomez testified. Carvis was found on the second floor where both witnesses testified the defendant and others had taken him. Carvis was stabbed in the abdomen and chest; Gomez testified that the defendant stabbed Carvis in the stomach once; Higgins-Bey said the defendant stabbed Carvis somewhere in the front. Griggs testified that his car was stolen, corroborating Gomez' testimony. Martinez corroborated Higgins-Bey's testimony about Rudy Ramirez when Martinez testified that he had seen Rudy Ramirez at Carvis' house 15 or 20 days before the murder and that Ramirez talked to Carvis about money. Gomez' testimony that Carvis was wearing the type of robe one wears after a shower was also corroborated. Contrary to the defendant's argument, Dr. Chambliss' testimony corroborated, not contradicted, the testimony of Gomez and Higgins-Bey. In addition to his testimony that Carvis suffered a wound to the abdomen, the doctor also testified that the knife with the broken tip could not have caused all the wounds suffered by Carvis. He also established that the second knife found in the kitchen, the steak knife with the serrated edge, could not have caused any of the wounds. Obviously, that testimony necessarily establishes that a third knife was used. Both witnesses testified that the defendant used his own knife. Finally, no reason has been suggested why the witnesses would untruthfully implicate the defendant.

If the testimony of an accomplice satisfied a jury that the defendant is guilty beyond a reasonable doubt, a reviewing court should not disturb the verdict unless it is plainly apparent that the necessary degree of proof is lacking. (*People v. Green* (1984), 125 Ill. App. 3d 734, 466 N.E.2d 630.) In our judgment it is not plainly apparent that the necessary degree of proof is lacking. The fact finders, who were made aware of all of the infirmities of the testimony of the accomplices, could nonetheless reasonably conclude that Gomez and Higgins-Bey were telling the truth.

■ Needless to say, we cannot obey the defendant's urging that we repudiate the pronouncement of the supreme court of Illinois in *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, which held that a reviewing court must view the evidence presented in the light most favorable to the prosecution and then determine whether the evidence could support a finding by any rational trier of fact that the defendant is guilty beyond a reasonable doubt. Under that pronouncement of *Collins*, the defendant's argument that he was not proved guilty of murder beyond a reasonable doubt must be rejected.

The defendant next maintains that he was not proved guilty beyond a reasonable doubt of the crime of home invasion. A person may not be convicted of home invasion unless at the time of entry into the home he knows or has reason to know that one or more persons are present. (Ill. Rev. Stat. 1987, ch. 38, par. 12—11.) The defendant contends that there was no evidence that the defendant knew or had reason to know that Raymond Carvis or anyone else was present when he entered the house.

■ The jury heard evidence that Carvis left his door unlocked when he was home; that Rudy Ramirez, with whom Carvis was having an affair, was present; that the 23rd was a Tuesday, a day when, according to a statement by Martinez, Carvis would be home and wished to be undisturbed. It is reasonable to infer that Ramirez also knew that Carvis would be home and passed that information on to the defendant. A car of one of the residents, Griggs, was parked outside. (*Cf. People v. Redisi* (1988), 172 Ill. App. 3d 1003, 527 N.E.2d 684.) The defendant took five men with him, a fact from which a reasonable person could infer that he anticipated meeting resistance from someone in the house. The same observation could be made about the fact that he was armed with a knife. A reasonable person could also infer from the immediate reaction of the defendant upon entering the house and seeing Carvis that the defendant was not surprised to see him. We judge, therefore, that a fact finder could reasonably conclude beyond a reasonable doubt that the defendant knew or had reason to

know that someone (other than Ramirez) was present when he entered Carvis' home.

The defendant next contends that the judge improperly permitted evidence that the State witnesses were former members of gangs. He contends that the evidence left the inference that the defendant was acting as a street-gang leader during the commission of the crime.

■ The State first argues that review of this issue has been waived by the defendant's failure to object at trial. The State refers to the fact that the defendant did not object at the time that Gomez and Higgins-Bey were testifying. There is no waiver on this point. The defendant preserved review of this point by his pretrial motion *in limine* seeking to bar any evidence concerning gangs. However, we find no reversible error in this evidence. Both witnesses said they were no longer gang members. Gomez said that he had left the gangs five months before he met the defendant. No suggestion or insinuation was made that the defendant was or ever had been a gang member. Since the jury heard evidence that the witnesses had been members of gangs but no evidence that the defendant had been a member, the more reasonable conclusion would be that the defendant was not and had not been a gang member. Under the circumstances, the admission of the witnesses that they had been gang members militated against them and in favor of the defendant.

In support of his argument the defendant points to the fact that a police officer testified that he learned of the nicknames of the codefendants through the "gangs." That evidence was brought out by the defendant. He cannot complain of error he invited. *People v. Bell* (1972), 53 Ill. 2d 122, 290 N.E.2d 214.

■ The defendant also assigns as error the prosecutor's argument that the defendant was the mastermind of the crime, the leader, the one with the plan. The prosecutor also said that the defendant was a "leader of lizards *** he and his lizards killed Raymond Carvis." First, the evidence justified the remark that the defendant was the mastermind of the crime, the leader and the man with the plan, regardless of any reference to gangs. The prosecutor has the right to make an argument based on the facts or legitimate inferences drawn from the facts. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 514 N.E.2d 970.) Second, the prosecution's reference to the defendant as a "leader of lizards" was also invited by the defense attorney's argument that Gomez and Higgins-Bey were "lizards." He referred to them as "lizards" on four different occasions.

■ The defendant next contends reversible error occurred by admission of testimony referring to a statement made by Robert Cardona.

Officer Halvorsen testified that Higgins-Bey, Gregory Cardona and Robert Cardona all gave court-reported statements that they signed. The officer first identified the court reporter statement of Higgins-Bey which was taken on July 16. The following occurred:

"Q. The statements that were given by Robert Cardona and Gregory Cardona, they were also court reporter statements, the same type and manner as this?

DEFENSE ATTORNEY: Objection.

THE COURT: Grounds?

DEFENSE ATTORNEY: Relevance.

THE COURT: Overruled.

STATE'S ATTORNEY: Is that correct?

A. The statements given by Robert Cardona and Gregory Cardona are the exact same type of a court-reported type statement which they signed.

Q. After that what did you do next with regards to your investigation?

A. I requested an arrest warrant for Harry Rodriguez."

The defendant's claim of error is restricted to the testimony concerning the court-reported statements by the Cardona brothers. No assignment of error is directed toward the testimony of Halvorsen that Robert Cardona made an oral statement "regarding this crime," that the officer tried to locate specific individuals Cardona told him were involved in the crime, that Halvorsen had another conversation with Robert Cardona the next day and that after that conversation he located Higgins-Bey, McCastle, Gregory Cardona and the defendant.

This issue appears to be one of the most-often recurring in courts of review and continues in spite of the fact that the supreme court has made a specific pronouncement on the question. In *People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146, a police officer testified that he had spoken to a victim at a hospital and he and his partner went to look for the defendant. The supreme court rejected the defendant's claim of error because the police officer did not testify to the substance of the conversation. It expressly held that to permit the officer to testify to the contents of the conversation would be error. 122 Ill. 2d at 248.

In the case before us, the jury had heard what Higgins-Bey had told the police. The effect of the testimony that his statement was the same type and manner as those of Robert Cardona and Gregory Cardona was that they, like Higgins-Bey, had implicated the defendant. In our judgment, the testimony was contrary to the rule of *People v. Gacho*. However, the defendant has waived any claim of error in Halvorsen's testimony. The judge specifically asked for the grounds of the objection, and

the defendant's attorney said, "Relevance." Failure to object on the proper ground waives any assignment of error. See *People v. Daniels* (1988), 172 Ill. App. 3d 616, 527 N.E.2d 59.

In his reply brief the defendant refers to the State's closing argument in which the prosecutor referred to this evidence. A defense objection was sustained. That ruling is pertinent for two reasons. First, it is fair to assume that the judge would have sustained a proper objection if made while Halvorsen was testifying and, second, the sustaining of the objection and the judge's subsequent instruction cured the error made during the argument. See *Gacho*, 122 Ill. 2d at 249.

The jury had already heard without objection that Robert Cardona had given Halvorsen an oral statement in which he "supplied information regarding this crime" and told him what individuals were involved in the murder. After that he looked for the defendant and others. The evidence of which the defendant now complains gave rise to an inference no more damaging to the defendant than the previous testimony to which no objection was made and is not assigned here as error. Therefore, any error was harmless. Before leaving this point, we wish to express our hope that in the future the State would follow the directions of the supreme court in *People v. Gacho* and would not persist in skirting, and often violating, the rules of admissibility governing hearsay.

The defendant next maintains that prejudicial error occurred when the judge permitted an amendment to the residential burglary indictment one month before trial. The State maintains that the amendment was to a formal defect in the indictment.

In July 1987, the grand jury returned an indictment charging the defendant and codefendants with murder, home invasion, residential burglary and armed violence. The indictment for residential burglary alleged that the defendant entered the dwelling place of Raymond Carvis with the intent to commit theft. The defendant's name was erroneously omitted from the residential burglary count of that indictment. The defendant and codefendants were then reindicted. The residential burglary count in the second indictment erroneously described the intended felony as murder, rather than theft. On December 2, 1987, the State moved to amend the residential burglary count of the indictment to change the intended felony from murder to theft. On December 8, the judge allowed the State's motion to amend the residential burglary count. On January 4, 1988, the judge denied the defendant's motion for reconsideration of the amendment and the trial began.

Section 111—5 of the Code of Criminal Procedure of 1963 provides that an indictment "may be amended on motion by the State's Attorney or defendant at any time because of formal defects." (Ill. Rev. Stat.

1985, ch. 38, par. 111—5.) The issue is whether the "defect" in the indictment was formal or substantive. We believe it was formal.

In *People v. McKendrick* (1985), 138 Ill. App. 3d 1018, 486 N.E.2d 1297, two separate indictments charged the defendant with deviate sexual assault. One charged that the defendant compelled an act of oral copulation on August 31, 1982. The second indictment charged that he compelled an act of anal intercourse on November 29, 1982. The complainant testified that the defendant forced her to commit an act of anal intercourse on August 31 and an act of oral copulation on November 29. The court allowed the State to amend both indictments at the close of the case to conform to the evidence. In the first indictment the word "anal" was substituted for "oral," and in the second indictment "oral" was substituted for "anal." The appellate court upheld the ruling of the trial court, pointing out that the State "did not alter any essential element of the indictment nor broaden its scope and did not change the offense [ ] *** and the amendments merely changed the manner in which the offense was committed." 138 Ill. App. 3d at 1027.

In *People v. Doss* (1987), 161 Ill. App. 3d 258, 514 N.E.2d 502, the defendant was charged with perjury. The indictment specified that the defendant made a particular statement under oath. It was later learned that the court reporter who testified to that statement before the grand jury had incorrectly transcribed the statement of the defendant which had been recorded on tape. The State was permitted to amend the indictment to allege the correct statement. The appellate court affirmed, holding that the amendment was to a formal defect.

The offense of residential burglary is committed when entry is made with intent to commit any felony or theft. (Ill. Rev. Stat. 1985, ch. 38, par. 19—3.) Just as in *McKendrick*, in which either act alleged constituted deviate sexual assault, so also in this case, residential burglary would have been committed whether the defendant intended to commit murder or a theft. The amendment occurred one month before trial. It realleged the intent to commit a theft. The defendant does not claim, nor do we think he could properly claim, that he was surprised by the amendment. See *People v. Coleman* (1971), 49 Ill. 2d 565, 276 N.E.2d 721.

The case cited by the defendant, *People v. Betts* (1979), 78 Ill. App. 3d 200, 397 N.E.2d 106, involved an amendment which changed the very offense with which the defendant was charged. The indictment was changed from delivery of a controlled substance which was a narcotic to delivery of a controlled substance which was not a narcotic. For these reasons, we hold that the judge did not err in permitting the State to amend the indictment.

The last assignments of error are addressed to the defendant's sentence. He contends that the sentence was excessive in view of his record and rehabilitation potential; that the murder was not accompanied by brutal and heinous behavior and, therefore, the sentence of natural life was improper; that the trial judge's remarks indicated he considered improper factors; and that the penalty statute for murder is unconstitutional.

■ The judge first held that the defendant qualified for the death penalty but found that the defendant's lack of substantial criminal background was a sufficient mitigating factor to prevent its imposition. Contrary to the defendant's claim here, the judge was correct in determining that the defendant was subject to the death penalty because he had been found guilty of murder committed during a home invasion. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)(c).) The judge then focused on the serious nature of the defendant's actions, and he expressly rejected the defendant's arguments in mitigation. He based his sentence on the aggravating factor that the murder was accompanied by brutal and heinous conduct indicative of wanton cruelty and for the further reason that the murder was committed during the course of a home invasion. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(1).) Our affirmance of the conviction for home invasion justifies the sentence without any further discussion. However, we agree with the judge that the murder was exceptionally brutal and the defendant's behavior was heinous and indicative of wanton cruelty. Carvis' arms were bound, and he had been stabbed or cut 29 times. The defendant was, in fact, the leader of the attack by six men. We know that he inflicted the first stab wound on Carvis. The fact that the State was unable to prove that he inflicted any of the 28 other wounds is not controlling. (See *People v. Wade* (1989), 185 Ill. App. 3d 898, 542 N.E.2d 58 (Defendant convicted of felony murder through accountability properly sentenced to a natural life sentence based upon the brutal and heinous behavior of the co-offender).) Even after stabbing Carvis, the defendant taunted him by placing his penis near Carvis' face and buttocks.

A trial judge is given wide discretion in sentencing in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. In addition, the trial judge is not required to detail for the record the process by which he concluded that the penalty he imposed was proper. *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

We have examined the statements made by the judge before sentencing and conclude that he did not base his decision on consideration of improper factors. We agree with his observations concerning the seri-

ousness of the offense outweighing the fact that the defendant lacked a substantial criminal record. We note also that the defendant's lack of remorse and calculating approach to the justice system were reflected by his statement to Gomez even after indictment when the defendant was brought to court, "Don't say nothing, we got the case beat." It would unnecessarily prolong this opinion to discuss all the cases cited by the defendant and State regarding sentencing. Each case must be decided on its own facts, and reference to the facts of many other cases provides us with scant assistance. Suffice it to say that we find no abuse of discretion in the sentence imposed.

■ Last, the defendant claims that the penalty statute for murder violates the equal protection clause and the due process clause of both the United States Constitution and the Illinois Constitution. Those same claims were advanced and rejected in *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662. The defendant implicitly asks us to refuse to follow *Cartalino*. We note that *Cartalino* has been cited with approval in *People v. Wade* (1989), 185 Ill. App. 3d 898, 542 N.E.2d 58, and *People v. Nester* (1984), 123 Ill. App. 3d 501, 462 N.E.2d 1011. We agree with the decision and reasoning of *Cartalino*.

■ The defendant has pointed out that judgment was inadvertently entered against the defendant on the charge of armed violence which had been dismissed by the State before trial. The judgment of conviction of armed violence, therefore, is vacated, and it is ordered that the mittimus shall be amended to remove the conviction of armed violence.

For these reasons, the judgments of conviction of murder, home invasion and residential burglary are affirmed. The judgment of conviction of armed violence is vacated with directions.

Judgment affirmed in part and vacated in part with directions.

RAKOWSKI, P.J., and McNAMARA, J., concur.