THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LINDON WEST, Defendant-Appellant.

First District (6th Division)   No. 1—91—3666

Opinion filed May 7, 1993.

Rita A. Fry, Public Defender, of Chicago (Mark Floyd Pasterski, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Faustmann, and Matthew J. McQaid, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Lindon West, of first-degree murder; he was sentenced to 25 years' imprisonment. He con-

tends that he is entitled to a new trial because the trial judge improperly ruled on certain character evidence.

Maurice John Burton testified that on December 25, 1989, he was playing pool with the defendant in a lounge in Chicago. After the last game, the defendant became angry, leaned across the pool table and pushed Burton. After being grabbed from behind and restrained by another man, the defendant was escorted by the others, including Burton's cousin, Leon Ragland, to the front door of the lounge. Immediately thereafter, Burton heard people shout, "Hit the floor, hit the floor," and he then heard gunshots as he dropped to the floor.

Leon Ragland testified that about 10 p.m. on December 25, 1989, he was at the same lounge, where he had stopped and talked to his cousin who worked there. While playing pool in the lounge, Ragland observed the defendant enter with a woman, and they were subsequently introduced to each other. About one-half hour later he heard the defendant's loud voice. Candice Gunn, the owner of the lounge, asked the defendant to leave the lounge. Ragland assisted in escorting the defendant to the door, where he gave the defendant a push out the door and Gunn immediately closed it. However, when Ragland peered out the window immediately above the door, he observed the defendant approach with a pistol. He then told the other patrons to "get down" because the defendant had a gun, but as he spoke he heard three or four gunshots. When the shots stopped he discovered the decedent, Carmen Hazelwood, lying on the floor and choking. Ragland also said that he never saw anyone grab the defendant while he was standing at the pool table.

Jean Thompson testified that she worked at the lounge as a barmaid on the night in question, and that she observed the defendant argue with Burton over the result of a game of pool. She then observed the owner of the lounge approach and walk to the door with the defendant and his girl friend. She then noticed that the decedent was attempting to walk along with them, but she asked decedent not to involve himself in the incident. She then heard Burton shouting that the defendant had a gun and as she immediately asked decedent to lay down, she heard four or five gunshots and the decedent "fell on top of [her]." After the shooting she saw the decedent lying on the floor. Thompson said she did not see the defendant push Burton or observe anyone grab the defendant.

Police officer Jeremiah Barry testified that he and his partner investigated the shooting. When he entered the lounge he found decedent lying on the floor, bleeding from his head. He recovered four

spent shell casings and one live round in front of the lounge on the sidewalk. Barry also noticed two bullet holes in the diamond-shaped window in the lounge door as well as blood adjacent to the bar area in the lounge. It was later established that the decedent died from a gunshot wound which entered the back of his neck.

Police officer James Shader testified that on December 26, 1989, he took photographs of the four bullet holes in the window and door of the lounge. He also said that the only blood he found at the immediate location was inside the lounge near the bar with none outside the lounge area.

Character witnesses and occurrence witnesses testified for the defendant. Henry Brown stated that the defendant did not have a reputation in the community for violence and that he was known to be honest. On cross-examination, Brown said that he had discussed the defendant's truthful nature with other people in the community.

Willie E. Wilkins, Sr., stated that the defendant was generally known in the community for being honest, peaceful and quiet. Wilkins also said that the defendant had to pass his Mason association's approval to become a member in that organization. As a result, the defendant's reputation as a truthful, peaceful and law-abiding person was discussed in conjunction with his membership application. According to Wilkins, the defendant was subsequently admitted as a member of the lodge. However, the trial judge would not allow defense counsel to elicit more details from Wilkins concerning the defendant's good works and attendance in his lodge.

Mary Mackie testified that she was the defendant's girl friend and was living with him. On December 25, 1989, she went to the lounge with the defendant and arrived there about 11 p.m. The defendant knew the decedent; they were good friends. Mackie sat at the bar while the plaintiff played pool, but about 20 minutes later, she turned and saw the defendant fall against a wall with a crowd surrounding him. She then saw someone grab the defendant and strike him on his head while a man held the defendant from behind. As she and the defendant struggled to leave, a man by the door grabbed the defendant and hit him in the face with his fist. Once outside the lounge Mackie fled, but she heard gunshots as she did so. About five minutes later the defendant joined her, although he was limping. Mackie said that the defendant did not display a pistol in the lounge, and she had not seen him attack anyone even though two men were holding pool sticks when they approached the defendant. Mackie also said the defendant had a reputation in the community for being peaceful, law-abiding and honest.

The State began the cross-examination of Mackie by asking if the defendant had ever pulled a gun on her. When the defendant's attorney objected, the court ordered a sidebar. Over the objection of the defendant, the judge said that the defendant had opened the door and that he would permit the State to show that the witness had made complaints against the defendant.

During the cross-examination of Mackie, the following occurred:

"Q. Ms. Mackie, did Lindon West ever point a gun at you?

A. No.

Q. Did Lindon West ever strike you?

A. Yes.

Q. On more than one occasion?

A. No, not really, no.

Q. Just one time in 17 years?

A. And I strike him back, yes. We have our arguments.

* * *

Q. Ms. Mackie, did you ever file a complaint at that time when Lindon West struck you?

A. Yes.

Q. Did you ever file a complaint another time when he struck you?

A. Yes.

Q. Did you ever file a complaint saying he pointed a gun at you?

A. No.

Q. In May of 1983, did you ever file a complaint saying Lindon West pointed a hand gun at you?

A. No."

Jerome Wright testified that he had been the defendant's friend for 10 years and that about midnight on December 25, 1989, he was parked outside the lounge with Ray Brandy. As he was sitting in his car, he observed the lounge door open and the defendant "fall out the door from somebody punching." He then saw three other men approach the defendant with pool sticks and strike the defendant while he lay on the ground. The defendant then stood up holding a gun and started shooting while the men with the pool sticks retreated into the lounge. After the shooting stopped, Wright opened the door to the lounge and saw the occupants lying on the floor. Wright, who had a prior conviction for theft, said that he did not observe the defendant bleeding or bruised after or during the incident. However, he did notice that the lounge door did not close until the defendant had fired several shots.

Ray Brandy testified that he had been the defendant's friend for over 10 years. About midnight he was talking to Wright when he saw the lounge door open and the defendant "fall out of the door." Several men then surrounded the defendant and struck him with their hands, feet and pool sticks for several minutes. As Brandy exited the car to assist the defendant, he saw the defendant pull a gun and then he heard gunshots, although he did not actually see the defendant fire.

The defendant testified that he had been steadily employed and was an active member of his church and of his social organization, the Masons. On December 25, 1989, about 11 p.m. he and Mackie went to the lounge where he bought the decedent a beer and talked to him for about 20 minutes. The defendant, the decedent and the decedent's family had been friends for many years; he denied having an altercation with the decedent on that night. The defendant played pool with Burton, but they began arguing about who had won the last game. After Burton shoved him and the defendant shoved him back, the other men in the bar approached him with pool sticks while one grabbed him from behind. Immediately thereafter, the barmaid struck him. He and the decedent backed towards the door trying to defend Mackie from the hostile crowd; he did not draw his gun because he did not want to hurt anybody.

The defendant and Mackie were pushed into a small vestibule area, while the crowd continued to hit and punch him with their pool sticks and fists. At this point the decedent attempted to leave with them, but a barmaid prevented him from doing so. After they opened the outside door, the defendant fell on his back on the ice and told Mackie to run. He then saw the decedent, who had followed to assist the defendant, although he could not ascertain if the decedent actually came outside the lounge. For about a minute the crowd beat him with pool sticks and kicked him; when he finally managed to raise himself to his right knee, he fired his gun without aiming at anyone in particular. He fired between these people because he feared for his life. After he fired the shots he heard the lounge door slam, but he did not have a clear view of the door while firing the shots. However, he was aware that the door was open at one point when he was firing the shots, because there were two other men positioned in the doorway. After he fired the shots the men immediately ran inside the lounge, except for one who was locked outside.

In rebuttal Officer Edward Daluga testified that on May 31, 1983, Mackie told him that the defendant had threatened her life

with a gun and that, at that time, Daluga placed the defendant under arrest on signed complaints by Mackie.

Colloquy occurred over the disposition of the complaints. Despite the uncertainty arising from that colloquy, we infer from the record that the defendant was either acquitted on all the charges or that the cases were dismissed. We note that when the defendant's attorney first objected to the introduction of the testimony before the cross-examination of Mackie began, he said that the case had been "[t]hrown out or SOL'd."

During closing argument the prosecutor referred to the cross-examination of Mackie and the testimony of Officer Daluga in rebuttal. She argued that "Mary Mackie has [a] very selective memory."

The defendant maintains that the cross-examination of Mackie, the rebuttal testimony of Daluga and the State's argument constituted reversible error.

The supreme court has spoken on this issue on a number of occasions. In *People v. Hermens* (1955), 5 Ill. 2d 277, 287, 125 N.E.2d 500, 505, the supreme court said that " '[N]either on cross-examination nor in rebuttal of proof of good character can particular acts of misconduct be shown.' " The court quoted from *People v. Page* (1937), 365 Ill. 524, 528, 6 N.E.2d 845.

In *People v. Greeley* (1958), 14 Ill. 2d 428, 432, 152 N.E.2d 825, 827, the supreme court, in citing *People v. Hermens*, said:

> "[W]e have consistently held it improper to permit a character witness to be cross-examined as to his own knowledge of particular acts of misconduct."

It is clear to us that the cross-examination of Mackie violated the rule.

In both *Hermens* and *Greeley*, the supreme court reversed convictions because of the improper cross-examination of a character witness. *Greeley* is particularly significant because the supreme court rejected the State's contention that the error was harmless. We do so also in this case. The State's case is far from overwhelming and depends entirely on the credibility of its witnesses. Similarly, the defendant's case depends on the credibility of his witnesses, including the defendant himself. Proof that an important witness like Mackie had previously alleged that the defendant threatened to use a gun on Mackie and had previously assaulted her causing her to file complaints against him was highly prejudicial and deprived the defendant of a fair trial.

The State cites *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018; *People v. Harris* (1992), 224 Ill. App. 3d 649, 587 N.E.2d 47; *People v. Devine* (1990), 199 Ill. App. 3d 1032, 557 N.E.2d 953; and *People v. Randle* (1986), 147 Ill. App. 3d 621, 498 N.E.2d 732. None of those cases supports the State's position.

In *Lynch*, the supreme court held that where self-defense is raised in a murder prosecution, evidence that the victim had been *convicted* of battery three times was admissible. In *Harris*, the appellate court reversed the defendant's conviction of aggravated battery because the State introduced evidence that the defendant, who claimed self-defense, had previously been *convicted* of battery and unlawful use of weapons. The appellate court rejected the State's claim that the defendant had opened the door for the introduction of *convictions* by introducing evidence of his own good character and the violent character of the victim. The State never contended that something other than convictions could be admitted. In *Devine* the appellate court upheld the admission of two previous *convictions* for battery by the defendant, who was charged with murder. The defendant introduced evidence that the deceased carried a pistol and had told the defendant that she once shot at an old boyfriend. He also testified that he was a peaceful person. The court held that the defendant had opened the door for the introduction of the evidence by introducing evidence of the deceased's previous misdemeanor conviction for unlawful use of weapons and other "alleged acts of violence in order to establish that she had a violent character." (*Devine*, 199 Ill. App. 3d at 1037.) In *Randle*, the appellate court held that the State was improperly permitted to show that a defense witness, not the defendant, had previously been convicted of a misdemeanor battery and aggravated assault. The court concluded that the error was harmless. We repeat that none of the cases cited by the State supports its position.

We conclude that, considering the nature of the evidence, the improper introduction of a previous complaint against the defendant for battery by Mackie and the threatened use of a gun against Mackie constituted prejudicial error and requires a new trial.

■ In view of our conclusion, it is unnecessary that we discuss at length the defendant's other claim that he was improperly restricted from submitting additional testimony on his church attendance and membership in the Masonic lodge. Suffice it to say that we find no error in the limitations the judge placed on this evidence; the ruling was within the sound discretion of the trial judge.

For these reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

Judgment reversed and remanded.

McNAMARA, P.J., and GIANNIS, J., concur.